I. Introduction
 

 Appellant Tax Foundation of Hawai'i challenges the State of Hawai'i's implementation of Hawai'i Revised Statutes (HRS) § 248-2.6 (Supp. 2015), which authorizes the State to be reimbursed for its costs in administering a rail surcharge on state general excise and use taxes on behalf of the City and County of Honolulu. More specifically, the issues on appeal are: (1) whether we lack jurisdiction because this is a "controversy with respect to taxes" under HRS § 632-1 ; (2) whether Tax Foundation has standing to bring its challenge; (3) whether the State violated HRS § 248-2.6 by retaining 10% of the gross proceeds of the surcharge without calculating the actual cost of administering the surcharge; and (4) whether the State's application of HRS § 248-2.6 is unconstitutional.
 

 We conclude that: (1) the circuit court had jurisdiction to hear Tax Foundation's claims because its complaint was not a "controversy with respect to taxes" within the meaning of HRS § 632-1 ; (2) Tax Foundation has standing
 
 [2]
 
 ; (3) the State did not violate HRS § 248-2.6 by retaining 10% of the gross proceeds of the surcharge; and (4) the State's application of HRS § 248-2.6 does not violate the Hawai'i or United States Constitutions. Accordingly, we vacate the circuit court's order and judgment granting the State's motion to dismiss for lack of jurisdiction, and remand this case to the circuit court with instructions to grant the State's motion for summary judgment on the merits.
 

 II. Background
 

 A. Act 247
 

 In 2005, the legislature enacted Act 247, authorizing counties to impose a surcharge of up to 0.5% on state general excise and use taxes. 2005 Haw. Sess. Laws Act 247, §§ 3-4 at 770-72. The purpose of Act 247 was to allow counties to levy surcharges "to fund public transportation systems."
 
 Id.
 
 , § 1 at 770. The county surcharges are levied, assessed, collected, and otherwise administered by the Department of Taxation (DOTAX).
 
 Id.
 
 , § 3 at 771. After collecting the surcharge, DOTAX transmits the funds to the State Department of Budget and Finance (Budget and Finance), which deposits them into special accounts.
 
 Id.
 
 , § 5 at 773. After deducting and withholding costs as specified in HRS § 248-2.6,
 
 [3]
 
 Budget and Finance disburses
 the remaining balance to each applicable county's Director of Finance.
 
 Id.
 
 , § 5 at 773.
 

 B. Proceedings in the Circuit Court
 

 [4]
 

 Four members of this court have determined that Tax Foundation has standing, but on different grounds. Justices McKenna, Pollack, and Wilson conclude that Tax Foundation established standing under HRS § 632-1, and as such, do not believe it is necessary to address taxpayer standing. I conclude that Tax Foundation has satisfied the requirements of taxpayer standing. Justice Nakayama concludes that Tax Foundation does not have standing to challenge the State's implementation of HRS § 248-2.6.
 
 See
 
 Part II, the Dissenting Opinion by Recktenwald, C.J., and the Dissenting Opinion by Nakayama, J., for detailed discussions regarding Tax Foundation's standing.
 

 HRS § 248-2.6 (Supp. 2015) provides:
 

 (a) If adopted by county ordinance, all county surcharges on state tax collected by the director of taxation shall be paid into the state treasury quarterly, within ten working days after collection, and shall be placed by the director of finance in special accounts. Out of the revenues generated by county surcharges on state tax paid into each respective state treasury special account,
 
 the director of finance shall deduct ten per cent of the gross proceeds of a respective county's surcharge on state tax to reimburse the State for the costs of assessment, collection, and disposition of the county surcharge on state tax incurred by the State
 
 . Amounts retained shall be general fund realizations of the State.
 

 (b) The amounts deducted for
 
 costs of assessment, collection, and disposition
 
 of county surcharges on state tax shall be withheld from payment to the counties by the State out of the county surcharges on state tax collected for the current calendar year.
 

 (c) For the purpose of this section, the costs of assessment, collection, and disposition of the county surcharges on state tax shall include any and all costs, direct or indirect, that are deemed necessary and proper to effectively administer this section and sections 237-8.6 and 238-2.6.
 

 (d) After the deduction and withholding of the costs under subsections (a) and (b), the director of finance shall pay the remaining balance on [a] quarterly basis to the director of finance of each county that has adopted a county surcharge on state tax under section 46-16.8. The quarterly payments shall be made after the county surcharges on state tax have been paid into the state treasury special accounts or after the disposition of any tax appeal, as the case may be. All county surcharges on state tax collected shall be distributed by the director of finance to the county in which the county surcharge on state tax is generated and shall be a general fund realization of the county, to be used for the purposes specified in section 46-16.8 by each of the counties.
 

 (Emphases added.)
 

 The Honorable Edwin C. Nacino presided.
 

 1. Tax Foundation's Complaint
 

 On October 21, 2015, Tax Foundation of Hawai'i (Tax Foundation) filed a class action
 
 [5]
 
 on behalf of all taxpayers in the City and County of Honolulu. The complaint alleged
 
 [6]
 
 that after Act 247 was enacted, the City and County of Honolulu enacted Ordinance 05-027, imposing a surcharge on state general excise and use taxes (Honolulu County surcharge). Tax Foundation asserted the following about the surcharge. Honolulu is the only county to have adopted such a surcharge. Budget and Finance has retained 10%
 
 [7]
 
 of the Honolulu County surcharge amounts collected by DOTAX since it was initially levied, and disbursed the remaining 90% to the City and County of Honolulu. During the fiscal years ending June 30, 2012, 2013, 2014, and 2015, Budget and Finance retained approximately $21.2, $19.3, $24.2, and $24.8 million, respectively, which went to the State general fund. As of December 31, 2015, the cumulative total of the State's surcharge withholdings was $177,865,487.24.
 

 Tax Foundation also alleged that the State violated HRS § 248-2.6(d) by retaining 10% of the City and County of Honolulu's surcharge gross proceeds without calculating the actual costs of administering it.
 
 [8]
 
 Tax Foundation alleged that the 10% retained by the State "grossly exceed[ed]" the costs incurred to assess, collect, and dispose of the Honolulu County surcharge funds. Tax Foundation further alleged that City and County of Honolulu taxpayers were required to pay a higher state tax than taxpayers of other counties as a result of the State's failure to follow HRS § 248-2.6, that the State had violated the general laws provision in Article VIII, § 1 of the Hawai'i Constitution, and violated the equal protection clauses of the Hawai'i and United States Constitutions.
 

 Tax Foundation sought declaratory, injunctive, and mandamus relief. In Count I, Tax Foundation sought an "order enjoining the State from continuing to violate" constitutional provisions and injunctive relief in the form of reimbursements, to the plaintiffs "and/or" the City and County of Honolulu, of amounts "improperly kept by the State." In
 Count II, Tax Foundation sought "mandamus directing the State to follow HRS § 248-2.6(d), and deduct and withhold only the cost of administering the Oahu surcharge and to pay the remaining balance of the 10% county surcharge initially withheld to Honolulu."
 

 2. The State's Motion to Dismiss
 

 The State filed a motion to dismiss the complaint, asserting: (1) the circuit court lacked jurisdiction because HRS § 632-1 (1993)
 
 [9]
 
 prohibits declaratory relief in " '
 
 any controversy
 
 ' with respect to taxes," (2) mandamus and injunctive relief was not warranted because HRS §§ 40-35 (Supp. 2006)
 
 [10]
 
 and 232-14.5 (Supp. 2006)
 
 [11]
 
 provided adequate and exclusive remedies for tax disputes in tax appeal court, and (3) Tax Foundation lacked standing. Regarding the relief sought by Tax Foundation, the State argued that "any taxpayer can pay a tax under protest and file suit for a refund under section 40-35, HRS, or timely file a tax refund claim and appeal from a denial of the refund claim to the Tax Appeal Court under section 232-14.5, HRS."
 

 3. Tax Foundation's Opposition to the State's Motion to Dismiss
 

 Tax Foundation opposed the State's motion to dismiss, arguing that the circuit court had subject matter jurisdiction because its complaint did not challenge the assessment or collection of taxes, but rather sought to correct mishandling after assessment and collection of the Honolulu County surcharge. Tax Foundation argued that the matter was not a "tax controversy" or an attack on the State's ability to collect taxes, and was instead an attempt to force the State to comply with HRS § 248-2.6.
 

 Tax Foundation analogized to the ICA opinion in
 
 Hawaii Insurers Council v. Lingle
 
 , where the ICA held that HRS § 632-1 's prohibition on actions regarding taxes did not apply because the plaintiff was not attempting to keep the State from assessing and collecting taxes.
 
 117 Hawai'i 454
 
 ,
 
 184 P.3d 769
 
 (App. 2008),
 
 aff'd in part and rev'd in part on other grounds
 
 ,
 
 120 Hawai'i 51
 
 ,
 
 201 P.3d 564
 
 (2008).
 

 Tax Foundation also changed its position regarding the relief it was requesting. Although Tax Foundation initially sought reimbursement to itself "and/or" the City and County of Honolulu in its complaint, in its opposition, it stated that it "does not seek any refund for itself or any other taxpayer." Tax Foundation argued that since it did not seek a declaratory ruling as to its own liability for taxes, and only sought to have the State pay its excess surcharge withholdings to the City and County of Honolulu, its claim did not belong in tax appeal court.
 

 Tax Foundation asserted that it had standing because it paid general excise tax on income derived from fundraising that it conducted to support its activities. As to the injury suffered, Tax Foundation argued that if the State returned the excess funds it had diverted to the City and County of Honolulu, the Honolulu surcharge "could end sooner." Tax Foundation argued that this injury was traceable to the State's actions, and was redressable, asserting that "the State could, if it chose, determine the costs" of administering the Honolulu County surcharge.
 

 4. Motions for Summary Judgment
 

 Tax Foundation filed a motion for summary judgment, and argued,
 
 inter
 

 alia
 
 , that the "plain and unambiguous language of HRS § 248-2.6" supported its interpretation, and that the State's reading of HRS § 248-2.6 is unconstitutional and forces the City and County of Honolulu taxpayers to subsidize the rest of the State.
 

 In its cross-motion for summary judgment, the State argued: (1) the circuit court lacked jurisdiction over Tax Foundation's claims, (2) HRS § 248-2.6 expressly requires that the State retain 10% of the Honolulu County surcharge, (3) retention of 10% does not violate the equal protection clause, (4) retention of 10% is consistent with the general laws provision of the state constitution, and (5) Tax Foundation was challenging a "policy decision" and should seek a statutory amendment from the legislature.
 

 5. Hearing on the Motions
 

 At a hearing on the various motions, the circuit court found that Tax Foundation's complaint presented a controversy arising out of a tax, and that it lacked jurisdiction over the dispute based on HRS § 632-1, stating that HRS § 632-1"broadly implies many controversies that can arise out of a tax." Tax Foundation orally requested leave to amend its complaint to clarify that the declaratory relief it sought was not subject to HRS § 632-1 's prohibition against tax controversies. The circuit court denied the request. The circuit court also determined that it lacked authority to impose mandamus relief on another branch of government. Thus, the circuit court granted the State's motion to dismiss, and did not reach the issue of whether Tax Foundation had standing. The court further ruled that the cross-motions for summary judgment were moot.
 

 The circuit court subsequently filed its written order granting the State's motion to dismiss. The order stated:
 

 The court, having read the memoranda in support and in opposition to the motion and the declarations filed therewith, and having heard the arguments of counsel, and based on the records and files herein and for good cause shown, GRANTS Defendant STATE OF HAWAII'S Motion to Dismiss Complaint Filed on October 21,2015 (Filed on November 10, 2015) for the reason that Plaintiff's claims for relief are barred by section 632-1, Hawai'i Revised Statutes, because Plaintiff's complaint constitutes or involves "a controversy with respect to taxes," and thus this court lacks subject matter jurisdiction.
 

 Plaintiff's request for leave to amend their complaint filed on October 21, 2015 is denied for the reason that the Court has dismissed the Plaintiff's complaint.
 

 The parties' cross motions for summary judgment filed on January 21, 2016, and March 3, 2016, respectively are, therefore moot, given the Court's decision to grant Defendant's motion to dismiss the complaint.
 

 Final judgment was entered on June 1, 2016.
 

 C. Appeal
 

 Tax Foundation timely appealed, seeking review of the circuit court's judgment and order granting the State's motion to dismiss. We granted Tax Foundation's subsequent request to transfer the appeal to this court.
 

 1. Tax Foundation's Opening Brief
 

 Tax Foundation raises three points of error. Tax Foundation argues that the circuit court erred in: (1) granting the State's motion to dismiss on the basis that it had no jurisdiction because the complaint sought declaratory relief involving a controversy with respect to taxes, (2) not granting Tax Foundation's motion for summary judgment, and (3) not allowing Tax Foundation the opportunity to amend its complaint.
 

 As to the first point of error, Tax Foundation argues "[t]his is NOT a dispute over taxes." (Capitalization in original). Tax Foundation asserts that its claim "arises from, and involves,
 
 only
 
 what the State does
 
 after
 
 the Surcharge has been assessed, collected, and deposited into the State's coffers." (Emphasis in original). Tax Foundation emphasizes the portion of HRS § 632-1 providing that controversies involving the interpretation of
 statutes are not prohibited.
 
 [12]
 
 Tax Foundation argues that HRS § 632-1 allows a declaratory ruling on the proper interpretation of HRS § 248-2.6 because such declaratory relief would not affect the State's ability to assess or collect the general excise tax or the Honolulu County surcharge.
 

 Tax Foundation also argues that the tax appeal court's limited jurisdiction would not include the claims in its complaint. HRS § 232-13 limits the jurisdiction of the tax appeal court to determining " 'the amount of valuation or taxes, as the case may be, in dispute[.]' " The liability for paying the general excise tax or Honolulu County surcharge is undisputed; therefore, Tax Foundation argues, the tax appeal court does not have jurisdiction over this case.
 

 As to the second point of error, Tax Foundation asserts that HRS § 248-2.6 is "clear and unambiguous[,]" and mandates that the State should retain only the costs it incurs in administering the Honolulu County surcharge.
 

 As to the third point of error, Tax Foundation argues that the circuit court abused its discretion in not allowing it "at least one opportunity to amend" its complaint. Tax Foundation cites Hawai'i Rules of Civil Procedure (HRCP) Rule 15(a)(2)
 
 [13]
 
 and case law stating that in the absence of an apparent or declared reason, such as undue delay, bad faith, or dilatory motive, leave to amend should be freely given.
 
 [14]
 

 2. The State's Answering Brief
 

 In its Answering Brief, the State argues: (1) the circuit court correctly dismissed the case for lack of subject matter jurisdiction because it is a tax controversy under HRS § 632-1, (2) the circuit court correctly denied Tax Foundation's request for mandamus relief, (3) Tax Foundation does not have standing, (4) Tax Foundation improperly argues the merits of the case, (5) the State should prevail on the merits, and (6) the circuit court did not abuse its discretion in denying Tax Foundation's oral motion to amend its complaint. The State also argues that Tax Foundation is "[a]sking the court to interfere with a statute ... [which] violates the separation of powers at the heart of our system of government."
 

 As to subject matter jurisdiction, the State argues that the plain language of HRS § 632-1 supports dismissal, because HRS § 632-1 applies to " 'any controversy with respect to taxes' " instead of being limited to the assessment or collection of taxes. The State asserts that interpretations of the federal Declaratory Judgment Act and Tax Anti-Injunction Act protect not just assessment and collection, but "any activities that are intended to or may culminate in the assessment or collection of taxes[.]" The State argues that Tax Foundation's lawsuit "may ultimately culminate in the 'collection' of the State's portion of the taxes being obstructed."
 

 The State also argues that this type of case belongs in tax appeal court rather than in circuit court. The State argues that the tax appeal court has jurisdiction to hear: (1) " 'taxpayer appeals from assessments' " pursuant to HRS Chapter 232, (2) " 'challenges to taxes paid under protest' " pursuant to HRS § 40-35, (3)" 'adverse rulings by the Director,' " and (4) appeals from the denial of refund claims by DOTAX pursuant to HRS § 232-14.5. The State also argues that, even if the court finds that this case is not a "controversy with respect to taxes," the circuit court lacks jurisdiction because the tax
 appeal statutes in HRS Chapter 232 provide a " 'special form of remedy' specific to tax cases" that must be followed according to HRS § 632-1.
 

 The State argues that it is appropriate for an appellate court to rule on the standing issue presented in the State's motion to dismiss, asserting that standing is a jurisdictional matter that the court must address as a threshold matter. The State further asserts that Tax Foundation does not satisfy the first and third prongs of the
 
 Sierra Club v. Hawai'i Tourism Authority
 
 ,
 
 100 Hawai'i 242
 
 ,
 
 59 P.3d 877
 
 (2002) (plurality opinion) test for standing.
 
 [15]
 

 As to the merits, the State argues that although "it would be improper for this Court to decide this case on the merits when the circuit court did not have an opportunity to address the merits first[,]" if this court decides to address the merits, the State should prevail as a matter of law based on the rules of statutory construction, legislative intent, and principles of statutory interpretation.
 

 3. Tax Foundation's Reply Brief
 

 In its Reply Brief, Tax Foundation argues: (1) the circuit court had jurisdiction pursuant to the ICA's decision in
 
 Hawaii Insurers Council
 
 , (2) Tax Foundation has standing, (3) the State misreads HRS § 248-2.6, (4) the State's interpretation of HRS § 248-2.6 is not consistent with the intent of the legislature, and (5) the circuit court erred in not allowing Tax Foundation to amend its complaint and amendment would not be futile.
 

 III. Standards of Review
 

 A. Existence of Jurisdiction and Dismissal for Lack of Jurisdiction
 

 "The existence of jurisdiction is a question of law that we review
 
 de
 

 novo
 
 under the right/wrong standard."
 
 Lingle v. Hawai'i Gov't Employees Ass'n, AFSCME, Local 152
 
 ,
 
 107 Hawai'i 178
 
 , 182,
 
 111 P.3d 587
 
 , 591 (2005).
 

 "A trial court's dismissal for lack of subject matter jurisdiction is a question of law, reviewable
 
 de
 

 novo
 
 ."
 
 Casumpang v. ILWU, Local 142
 
 ,
 
 94 Hawai'i 330
 
 , 337,
 
 13 P.3d 1235
 
 , 1242 (2000) (emphasis removed) (citing
 
 McCarthy v. United States
 
 ,
 
 850 F.2d 558
 
 , 560 (9th Cir. 1988) ).
 

 Our review [of a motion to dismiss for lack of subject matter jurisdiction] is based on the contents of the complaint, the allegations of which we accept as true and construe in the light most favorable to the plaintiff. Dismissal is improper unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.
 

 Casumpang
 
 ,
 
 94 Hawai'i at 337
 
 ,
 
 13 P.3d at 1242
 
 (citations and quotation marks omitted).
 

 B. Standing
 

 "[T]he issue of standing is reviewed
 
 de
 

 novo
 
 on appeal."
 
 Mottl v. Miyahira
 
 ,
 
 95 Hawai'i 381
 
 , 388,
 
 23 P.3d 716
 
 , 723 (2001) (citation omitted).
 

 C. Statutory Interpretation
 

 "The interpretation of a statute is a question of law reviewable
 
 de
 

 novo
 
 ."
 
 Peer News LLC v. City & Cty. of Honolulu
 
 ,
 
 138 Hawai'i 53
 
 , 60,
 
 376 P.3d 1
 
 , 8 (2016).
 

 D. Constitutional Questions
 

 "We review questions of constitutional law
 
 de
 

 novo
 
 , under the right/wrong standard."
 
 State v. Kalaola
 
 ,
 
 124 Hawai'i 43
 
 , 49,
 
 237 P.3d 1109
 
 , 1115 (2010) (citation omitted)
 
 .
 

 E. Summary Judgment
 

 "On appeal, the grant or denial of summary judgment is reviewed
 
 de
 

 novo
 
 ."
 
 First Ins. Co. of Hawai'i v. A&B Properties
 
 ,
 
 126 Hawai'i 406
 
 , 413-14,
 
 271 P.3d 1165
 
 , 1172-73 (2012) (citation omitted). Furthermore,
 

 [S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and inferences drawn therefrom in the light most favorable to the party opposing the motion.
 

 Id.
 

 (citation omitted) (brackets in original).
 

 IV. Discussion
 

 A. The Relief Requested by Tax Foundation Does Not Constitute a Tax Refund Claim
 

 We must first address whether the circuit court had subject matter jurisdiction to adjudicate Tax Foundation's complaint. The tax appeal court has exclusive jurisdiction over tax refund claims. HRS §§ 232-13 and 232-14.5(a), (c). HRS § 232-13 states that the jurisdiction of the tax appeal court is limited to disputes about the "amount of valuation or taxes." HRS § 232-14.5(a) provides that a denial of a tax refund claim by DOTAX "may be appealed by the filing of a written notice of appeal to a board of review or the tax appeal court[,]" and subsection (c) provides that "this section shall apply to tax refund claims for all taxes administered by the department of taxation." The circuit court therefore does not have jurisdiction over tax refund claims, and only the tax appeal court may consider tax refund claims.
 

 The State argues that Tax Foundation seeks a tax reimbursement to itself and class members, and as such, presents a tax refund controversy over which the tax appeal court has exclusive jurisdiction. Tax Foundation, however, now only seeks reimbursement to the City and County of Honolulu. Initially, Tax Foundation's complaint effectively sought a partial tax refund by requesting reimbursement to itself, its class members, "and/or" the City and County of Honolulu of the allegedly improperly kept surcharge funds. However, Tax Foundation later disclaimed any refund remedy for itself and its class members in its opposition to the State's motion to dismiss, leaving only the City and County of Honolulu to recover. Therefore, taxpayer liability is not in dispute.
 

 Because the tax appeal court's jurisdiction is limited to determining "the amount of valuation or taxes, as the case may be, in dispute[,]" HRS § 232-13, and here there is no dispute about any taxpayer's tax liability, Tax Foundation cannot bring its claim before the tax appeal court. Tax Foundation's dispute concerns only the post-collection disposition of the surcharge funds. Accordingly, the circuit court is not barred from hearing Tax Foundation's claim based on HRS § 232-14.5.
 

 B. HRS § 632-1 Does Not Bar Subject Matter Jurisdiction in this Suit
 

 The parties dispute whether the circuit court correctly dismissed this case for lack of subject matter jurisdiction under HRS § 632-1, which prohibits declaratory judgment actions in any "controversy with respect to taxes[.]"
 
 [16]
 
 Tax Foundation and the State make arguments related to the portions of HRS § 632-1 emphasized below:
 

 In cases of actual controversy, courts of record, within the scope of their respective jurisdictions, shall have power to make
 binding adjudications of right, whether or not consequential relief is, or at the time could be, claimed, and no action or proceeding shall be open to objection on the ground that a judgment or order merely declaratory of right is prayed for;
 
 provided that declaratory relief may not be obtained in any district court, or in any controversy with respect to taxes
 
 , or in any case where a divorce or annulment of marriage is sought.
 
 Controversies involving the interpretation of deeds, wills, other instruments of writing, statutes, municipal ordinances, and other governmental regulations, may be so determined
 
 , and this enumeration does not exclude other instances of actual antagonistic assertion and denial of right.
 

 HRS § 632-1 (emphasis added).
 

 The ICA has held that HRS § 632-1 's tax exclusion provision prohibits declaratory relief in tax matters, in order to "permit the government to assess and collect taxes alleged to be due it without judicial interference."
 
 Hawaii Insurers Council v. Lingle
 
 ,
 
 117 Hawai'i 454
 
 , 463,
 
 184 P.3d 769
 
 , 778 (App. 2008) (citation and quotation marks omitted),
 
 aff'd in part and rev'd in part on other grounds
 
 ,
 
 120 Hawai'i 51
 
 ,
 
 201 P.3d 564
 
 (2008). In
 
 Hawaii Insurers Council
 
 , an insurance trade association challenged the constitutionality of a statute that permitted the Director of Finance to transfer funds from the Compliance Resolution Fund, into which assessments imposed on insurers were deposited, to the State's General Fund.
 
 Id.
 
 at 457,
 
 184 P.3d at 772
 
 . The circuit court determined that it lacked jurisdiction because the lawsuit violated the prohibition against declaratory relief actions in tax controversies under HRS § 632-1.
 

 Id.
 

 at 458
 
 ,
 
 184 P.3d at 773
 
 . The ICA determined that the transfer of funds operated as a tax, but rejected the argument that the matter was a prohibited "controversy with respect to taxes" under HRS § 632-1.
 

 Id.
 

 at 463
 
 ,
 
 184 P.3d at 778
 
 . The ICA noted that HRS § 632-1 was amended in 1972 to mirror the tax exclusion in the federal Declaratory Judgment Act, which "prohibits declaratory relief in tax matters to permit the government to assess and collect taxes alleged to be due it without judicial interference."
 

 Id.
 

 The ICA determined that the Insurers Council was not attempting to keep the State from assessing and collecting taxes, but rather challenging the transfer of proceeds on the ground that they were unconstitutional taxes.
 

 Id.
 

 Because the constitutional challenge did not interfere with the government's assessment or collection of taxes, the ICA concluded that the case was not a "controversy with respect to taxes" within the meaning of HRS § 632-1 or HRCP Rule 57.
 

 Id.
 

 As previously indicated, HRS § 632-1 was amended in 1972 to mirror the tax exception in the federal Declaratory Judgment Act,
 
 28 U.S.C. § 2201
 
 . 1972 Haw. Sess. Laws Act 89, § 1 at 338. We therefore turn to federal case law interpreting the Declaratory Judgment Act's tax exception.
 

 In
 
 Cohen v. United States
 
 ,
 
 650 F.3d 717
 
 , 719 (D.C. Cir. 2011), appellants argued that the refund procedure created by the Internal Revenue Service for taxpayers to recoup money from an illegal tax on phone calls was unlawful. The Court of Appeals for the District of Colombia rejected a broad interpretation of the Declaratory Judgment Act's tax exclusion, which would have precluded all suits "conceivably 'with respect to Federal taxes.' "
 

 Id.
 

 at 730
 
 . The court looked to the legislative history of the Declaratory Judgment Act, which stated that "the orderly and prompt determination and collection of Federal taxes should not be interfered with."
 

 Id.
 

 (quoting S. Rep. No. 74-1240, at 11 (1935)). The court also considered precedent stating that the interpretation of the Declaratory Judgment and Anti-Injunction Acts was coextensive, and ultimately determined that " 'with respect to Federal taxes' means 'with respect to the assessment or collection of taxes.' "
 

 Id.
 

 at 727 (citing
 
 E. Kentucky Welfare Rights Org. v. Simon
 
 ,
 
 506 F.2d 1278
 
 , 1284 (D.C. Cir. 1974) ;
 
 Ecclesiastical Order of the ISM of AM, Inc. v. I.R.S.
 
 ,
 
 725 F.2d 398
 
 , 404-05 (6th Cir. 1984) ;
 
 In re Leckie Smokeless Coal Co.
 
 ,
 
 99 F.3d 573
 
 , 583-84 (4th Cir. 1996) ;
 
 Perlowin v. Sassi
 
 ,
 
 711 F.2d 910
 
 , 911 (9th Cir. 1983) ;
 
 McCabe v. Alexander
 
 ,
 
 526 F.2d 963
 
 (5th Cir. 1976) ;
 
 Tomlinson v. Smith
 
 ,
 
 128 F.2d 808
 
 , 811 (7th Cir. 1942) ). Since the suit did not affect the assessment or collection of the tax, the Declaratory Judgment Act did not limit the court's jurisdiction.
 

 Id.
 

 at 736 ;
 
 see also
 

 Direct Marketing Ass'n v. Brohl
 
 , --- U.S. ----,
 
 135 S.Ct. 1124
 
 ,
 
 191 L.Ed.2d 97
 
 (2015) (constitutional challenge to statutory reporting requirements preceding the assessment and collection of taxes was not barred).
 

 We are persuaded by the D.C. Circuit Court's interpretation of the federal Declaratory Judgment Act, and the reasoning of the ICA. Accordingly, we adopt the ICA's holding in
 
 Hawaii Insurers Council
 
 that declaratory relief may be obtained in tax matters under HRS § 632-1 where such relief does not interfere with the assessment or collection of taxes.
 

 Declaratory relief may be obtained here because Tax Foundation's claim does not interfere with the government's ability to assess or collect either the general excise and use tax, or the Honolulu County surcharge. A ruling in Tax Foundation's favor would not impact DOTAX's ability to assess or collect these taxes because Tax Foundation does not dispute its liability to pay general excise and use tax, or the Honolulu County surcharge. Tax Foundation contests only the "administration and allocation" of the Honolulu County surcharge after it is assessed and collected.
 

 Accordingly, this is not a "controversy with respect to taxes" and the exclusionary provision does not apply because only suits that would restrain the assessment and collection of taxes fall within the scope of HRS § 632-1. The circuit court therefore had jurisdiction and erred in dismissing on that basis.
 

 PART TWO: TAX FOUNDATION HAS HRS § 632-1 STANDING
 

 (By: McKenna, J., with whom Pollack and Wilson, JJ., join)
 

 C. Standing
 

 1. Introduction
 

 In general, standing is a prudential concern regarding whether the party seeking a forum has alleged a sufficient personal stake in the outcome of a controversy as to justify the exercise of the court's remedial powers on the party's behalf.
 
 See
 

 Life of the Land v. Land Use Comm'n
 
 ("
 
 Life of the Land II
 
 "),
 
 63 Haw. 166
 
 , 172,
 
 623 P.2d 431
 
 , 438 (1981) (citation omitted). In Hawai'i state courts, standing is a prudential consideration regarding the "proper - and properly limited - role of courts in a democratic society" and is not an issue of subject matter jurisdiction, as it is in federal courts. Importantly, this court has repeatedly ruled that standing requirements may be tempered, or even prescribed, by legislative declarations of policy.
 
 [17]
 
 Therefore, standing requirements can differ based on legislative enactments.
 

 HRS Chapter 632 is an example of a statutory scheme in which standing requirements have been prescribed by legislative declarations.
 
 See
 

 Life of the Land II
 
 ,
 
 63 Haw. at
 
 172 & n.5,
 
 623 P.2d at
 
 438 & n.5. Through language in HRS Chapter 632, the Hawai'i State Legislature has stated its views regarding when a party should be able to bring declaratory relief claims under that Chapter. Despite this, some of our recent opinions have required a party requesting declaratory relief under HRS § 632-1 to also satisfy the common law three-part "injury in fact" test for standing, which requires a showing that (1) the plaintiff has suffered an actual or threatened injury as a result of the defendant's conduct, (2) the injury is fairly traceable to the defendant's actions, and (3) a favorable decision would likely provide relief for the plaintiff's injury.
 
 [18]
 
 Requiring satisfaction of this test, which was originally developed in federal courts due to subject matter jurisdiction concerns, limits declaratory relief otherwise available under the language of Chapter 632, thereby contravening prudential
 considerations of the "proper - and properly limited - role of courts" as "prescribed" by the Hawai'i State Legislature.
 

 Based on these considerations as well as the reasons discussed below, we hold that a party seeking declaratory relief under HRS § 632-1 need not satisfy the three-part "injury in fact" test to have standing. Rather, consistent with standing requirements prescribed by the legislature through the language of HRS § 632-1, we hold that a party has standing to seek declaratory relief in a civil case brought pursuant to HRS § 632-1(b) (2016): (1) where antagonistic claims exist between the parties (a) that indicate imminent and inevitable litigation, or (b) where the party seeking declaratory relief has a concrete interest in a legal relation, status, right, or privilege that is challenged or denied by the other party, who has or asserts a concrete interest in the same legal relation, status, right, or privilege; and (2) a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding. Applying this standard, Tax Foundation has standing to seek declaratory relief under HRS § 632-1. We therefore need not address whether Tax Foundation has "taxpayer standing."
 
 [19]
 

 2. Background
 

 In this case, Tax Foundation, as a putative class representative, requested a declaratory judgment pursuant to HRS § 632-1 (1993), as well as other ancillary relief. The circuit court dismissed Tax Foundation's complaint due to an alleged lack of subject matter jurisdiction based on the language in HRS § 632-1 that declaratory judgments are not available for "any controversy with respect to taxes." The State of Hawai'i ("State") had alternatively requested dismissal based on Tax Foundation's alleged lack of standing, but the circuit court did not address standing due to its dismissal based on subject matter jurisdiction grounds.
 

 In its Answering Brief, the State reasserts Tax Foundation's alleged lack of standing as an alternative basis on which this court should affirm the circuit court's dismissal of Tax Foundation's lawsuit. The State argues that because Tax Foundation seeks to have the State pay the City and County of Honolulu ("City") the portion of the ten percent deduction from the City's 0.5% general excise tax surcharge ("Surcharge") that exceeds costs of administration, only the City can meet the three-part "injury in fact" test for standing.
 
 [20]
 

 In its Reply Brief, Tax Foundation argues it has standing to request declaratory relief. It did not specifically assert "taxpayer standing," but it alleges that "[g]overnments do not pay taxes; taxpayers do[,]" and that as a taxpayer, it is continuously injured by the State's diversion of money away from the Honolulu Authority for Rapid Transportation ("HART") project, "which causes over-collection of the amounts needed to sustain HART." It contends that a favorable decision would provide more support to HART for the benefit of the City to the relief of affected taxpayers, including itself, and that the more the State diverts, the less the City receives, and the longer the Surcharge is needed, the more taxpayers must pay.
 

 3. Discussion
 

 a. The Nature of Standing Requirements in Hawai'i State Courts
 

 Before discussing standing requirements for purposes of HRS § 632-1, it is important to clarify that, in Hawai'i state courts, the issue of standing is a prudential concern and not an issue of subject matter jurisdiction, as suggested by some of our cases. For example, in
 
 Keahole Defense Coalition, Inc. v. Board of Land & Natural Resources
 
 ("
 
 Keahole
 
 "),
 
 110 Hawai'i 419
 
 ,
 
 134 P.3d 585
 
 (2006), we stated that "standing is a jurisdictional issue that may be addressed at any stage of a case."
 
 Keahole
 
 ,
 
 110 Hawai'i at 427
 
 ,
 
 134 P.3d at 593
 
 (citation and footnote omitted). In
 
 Akinaka
 
 , we also stated that this court has a duty to address standing
 
 sua
 

 sponte
 
 , even if it is not raised by the parties.
 
 See
 

 Akinaka
 
 , 91 Hawai'i at 55, 979 P.2d at 1081.
 

 In federal courts, standing does implicate subject matter jurisdiction. The three-part "injury in fact" test is based on the "cases and controversies" limitation on federal court jurisdiction under Article III, section 2 of the United States Constitution.
 
 See
 

 Lujan v. Defenders of Wildlife
 
 ,
 
 504 U.S. 555
 
 , 560,
 
 112 S.Ct. 2130
 
 ,
 
 119 L.Ed.2d 351
 
 (1992) ( "Though some of its elements express merely prudential considerations that are part of judicial self-government, the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." (citation omitted)). Thus, in federal courts, although standing secondarily implicates prudential concerns, standing is fundamentally an issue of subject matter jurisdiction. In other words, in federal courts, where a plaintiff lacks standing, no "case or controversy" exists to confer subject matter jurisdiction.
 

 Hawai'i state courts, on the other hand, are not subject to a "case or controversy" jurisdictional limitation. Rather, pursuant to Article VI, Section 1 of the Constitution of the State of Hawai'i, "[t]he several courts ... have original and appellate jurisdiction as provided by law ...." In Hawai'i courts, standing is solely an issue of justiciability, arising out of prudential concerns of judicial self-governance.
 
 See
 

 Life of the Land II
 
 ,
 
 63 Haw. at 171-72
 
 ,
 
 623 P.2d at 438
 
 . As explained by Justice Nakamura in
 
 Trustees of the Office of Hawaiian Affairs v. Yamasaki
 
 ,
 
 69 Haw. 154
 
 ,
 
 737 P.2d 446
 
 (1987) :
 

 Unlike the federal judiciary, the courts of Hawaii are not subject to a cases or controversies limitation like that imposed by Article III, § 2 of the United States Constitution
 
 . But like the federal government, ours is one in which the sovereign power is divided and allocated among three co-equal branches. Thus, we have taken the teachings of the Supreme Court to heart and adhered to the doctrine that the use of judicial power to resolve public disputes in a system of government where there is a separation of powers should be limited to those questions capable of judicial resolution and presented in an adversary context. And, we have admonished our judges that even in the absence of constitutional restrictions, they must still carefully weigh the wisdom, efficacy, and timeliness of an exercise of their power before acting, especially where there may be an intrusion into areas committed to other branches of government.
 

 Our guideposts for the application of the rules of judicial self-governance founded in concern about the proper - and properly limited - role of courts in a democratic society reflect the precepts enunciated by the Supreme Court.
 
 When confronted with an abstract or hypothetical question, we have addressed the problem in terms of a
 prohibition against rendering advisory opinions;
 
 when asked to decide whether a litigant is asserting legally recognized interests, personal and peculiar to him, we have spoken of standing
 
 ; when a later decision appeared more appropriate, we have resolved the justiciability question in terms of ripeness; and when the continued vitality of the suit was questionable, we have invoked the mootness bar.
 

 We have also followed the teachings of the Supreme Court where political questions" are concerned....
 

 Yamasaki
 
 ,
 
 69 Haw. at 170-72
 
 ,
 
 737 P.2d at 455-56
 
 (internal citations, quotation marks, punctuation, and footnotes omitted) (emphases added).
 

 Thus,
 
 Yamasaki
 
 recognizes that standing is a prudential concern in Hawai'i state courts, which are not subject to the case and controversy subject matter jurisdiction limitation of federal courts.
 
 Yamasaki
 
 also noted that standing is a prudential concern "founded in concern about the proper - and properly limited - role of courts in a democratic society."
 
 69 Haw. at 171
 
 ,
 
 737 P.2d at 456
 
 (citation omitted). Furthermore, our previous pronouncements that "standing principles are governed by 'prudential rules' of judicial self-governance," and that "the touchstone of this court's notion of standing is 'the needs of justice[,]' "
 
 see, e.g.
 
 ,
 
 Mottl
 
 ,
 
 95 Hawai'i at 389-90
 
 ,
 
 23 P.3d at 724-25
 
 , reflect our awareness that standing is a prudential issue and not an issue of subject matter jurisdiction, as "the needs of justice" cannot eliminate the requirement of subject matter jurisdiction.
 
 [21]
 
 In addition, as pointed out earlier, in Hawai'i state courts, standing requirements may be tempered, or even prescribed, by legislative declarations of policy.
 
 See
 

 Life of the Land II
 
 ,
 
 63 Haw. at 172
 
 ,
 
 623 P.2d at 438
 
 .
 

 Courts of other states also recognize that standing is a prudential concern and not an issue of subject matter jurisdiction.
 
 See, e.g.
 
 ,
 
 Weatherford v. City of San Rafael
 
 ,
 
 218 Cal.Rptr.3d 394
 
 ,
 
 395 P.3d 274
 
 , 278 (2017) ("Unlike the federal Constitution, our state Constitution has no case or controversy requirement imposing an independent jurisdictional limitation on our standing doctrine.... Our standing jurisprudence nonetheless reflects a sensitivity to broader prudential and separation of powers considerations elucidating how and when parties should be entitled to seek relief under particular statutes." (citation omitted));
 
 Deutsche Bank Nat'l Trust Co. v. Johnston
 
 ,
 
 369 P.3d 1046
 
 , 1052 (N.M. 2016) ("[W]hile a plaintiff's ... lack of prudential standing [is] not strictly jurisdictional, [it] implicate[s] the 'properly limited ... role of courts in a democratic society' and [is a] relevant concern[ ] throughout a litigation." (citation omitted));
 
 Biggs v. Cooper ex rel. Cty. of Maricopa
 
 ,
 
 236 Ariz. 415
 
 ,
 
 341 P.3d 457
 
 , 460 (2014) ("In Arizona, standing is a prudential consideration rather than a jurisdictional one." (citation omitted));
 
 Nicely v. State
 
 ,
 
 291 Ga. 788
 
 ,
 
 733 S.E.2d 715
 
 , 719 n.6 (2012) ("[W]e note that prudential standing generally is not jurisdictional." (citation omitted));
 
 Fumo v. City of Philadelphia
 
 ,
 
 601 Pa. 322
 
 ,
 
 972 A.2d 487
 
 , 500 n.5 (2009) ("[I]n Pennsylvania, the issue of standing implicates prudential concerns." (citation omitted)).
 

 Therefore, we preliminarily clarify that, in Hawai'i state courts, standing is not an issue of subject matter jurisdiction,
 
 [22]
 
 but arises solely out of justiciability concerns based on prudential concerns of judicial self-governance, and is based on "concern about the proper - and properly limited - role of courts in a democratic society." Accordingly, although Hawai'i state courts may consider standing even when not raised by the parties, they are not required to do so
 
 sua
 

 sponte
 
 , as they would be required to do if they perceive issues of subject matter jurisdiction.
 

 In this case, however, the State expressly alleged lack of standing as an alternative basis for its dismissal motion. We therefore address standing in our
 
 de
 

 novo
 
 review of the parties' cross motions for summary judgment.
 

 b. Declaratory Judgments under HRS Chapter 632
 

 Tax Foundation premises its request for declaratory relief on HRS § 632-1, which is part of HRS Chapter 632 governing "Declaratory Judgments." The Chapter has four sections, HRS § 632-1 relating to "[j]urisdiction; controversies subject to," HRS § 632-2 (2016) relating to "[a]ppeals," HRS § 632-3 (2016) relating to "[f]urther relief upon judgment," and HRS § 632-6 (2016) relating to "[p]rovisions, remedial." HRS § 632-1 provides as follows:
 

 Jurisdiction; controversies subject to. (a) In cases of actual controversy, courts of record, within the scope of their respective jurisdictions, shall have power to make binding adjudications of right, whether or not consequential relief is, or at the time could be, claimed, and no action or proceeding shall be open to objection on the ground that a judgment or order merely declaratory of right is prayed for; provided that declaratory relief may not be obtained in any district court, or in any controversy with respect to taxes, or in any case where a divorce or annulment of marriage is sought. Controversies involving the interpretation of deeds, wills, other instruments of writing, statutes, municipal ordinances, and other governmental regulations may be so determined, and this enumeration does not exclude other instances of actual antagonistic assertion and denial of right.
 

 (b) Relief by declaratory judgment may be granted in civil cases where an actual controversy exists between contending parties, or where the court is satisfied that antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation, or where in any such case the court is satisfied that a party asserts a legal relation, status, right, or privilege in which the party has a concrete interest and that there is a challenge or denial of the asserted relation, status, right, or privilege by an adversary party who also has or asserts a concrete interest therein, and the court is satisfied also that a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding. Where, however, a statute provides a special form of remedy for a specific type of case, that statutory remedy shall be followed; but the mere fact that an actual or threatened controversy is susceptible of relief through a general common law remedy, a remedy equitable in nature, or an extraordinary
 legal remedy, whether such remedy is recognized or regulated by statute or not, shall not debar a party from the privilege of obtaining a declaratory judgment in any case where the other essentials to such relief are present.
 

 When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself, and we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.
 
 See
 

 In re Doe
 
 ,
 
 95 Hawai'i 183
 
 , 191,
 
 20 P.3d 616
 
 , 624 (2001) (citation omitted).
 

 HRS § 632-1 is somewhat verbose, but can be broken down as follows. The title of HRS § 632-1 is "Jurisdiction; controversies subject to."
 
 [23]
 
 In general, subsection (a) discusses subject matter jurisdiction. It starts by providing that, in cases of actual controversy, courts of record have power to make binding adjudications of right whether or not consequential relief is, or at the time could be, claimed. It also provides that a declaratory relief action cannot be objected to on the grounds that declaratory relief is the only relief sought; in other words, other remedies, such as damages or injunctive relief, need not also be sought.
 
 [24]
 
 Subsection (a) further provides that the district courts do not have subject matter jurisdiction over declaratory relief claims
 
 [25]
 
 and that other courts of record cannot grant declaratory relief in any controversy with respect to taxes or in a case seeking divorce or annulment. The subsection clarifies, however, that declaratory relief can be sought in controversies involving the interpretation of deeds, wills, other instruments of writing, statutes, municipal ordinances, or other governmental regulations. It further states that this list is not exhaustive, and that declaratory relief can also be sought in other situations involving other antagonistic assertions or denials of rights.
 

 Subsection (b) of the statute more specifically addresses "controversies subject to" declaratory relief.
 
 [26]
 
 It states that relief
 by declaratory judgment may be granted in civil cases
 
 [27]
 
 where (1) there is an actual controversy between contending parties;
 
 or
 
 (2) (a) antagonistic claims exist between the parties (i) that indicate imminent and inevitable litigation, or (ii) where the party seeking declaratory relief has a concrete interest in a legal relation, status, right, or privilege that is challenged or denied by the other party, who has or asserts a concrete interest in the same legal relation, status, right, or privilege; and (b) a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding.
 
 [28]
 

 As indicated in the paragraph above, the plain language of HRS § 632-1(b) seemingly allows for declaratory relief where there is an "actual controversy between contending parties"
 
 or
 
 "antagonistic claims" are present between contending parties (along with other requirements). We discuss the first "or" in HRS § 632-1(b) in more detail in Section IV.C.3.d below.
 

 In any event, subsection (b) of HRS § 632-1 further provides that where another statute provides a special form of remedy for a specific type of case, that statutory remedy must be followed. The subsection also clarifies, however, that if the other requirements for declaratory relief delineated in the statute are met, a party will not be prohibited from obtaining a declaratory judgment even if the actual or threatened controversy is susceptible of relief through a general common law remedy, an equitable remedy, or an extraordinary legal remedy, whether or not such a remedy is recognized by statute.
 

 HRS § 632-6 then provides:
 

 This chapter is declared to be remedial. Its purpose is to afford relief from the uncertainty and insecurity attendant upon controversies over legal rights,
 
 without requiring one of the parties interested so to invade the rights asserted by the other as to entitle the party to maintain an ordinary action therefor
 
 . It is to be liberally interpreted and administered, with a view to making the courts more serviceable to the people.
 

 (Emphasis added.)
 

 Thus, nothing in the language of HRS § 632-1, the statement of legislative intent in HRS § 632-6, nor any other provision in HRS Chapter 632 requires a party to satisfy a three-part "injury in fact" test in order to seek declaratory relief.
 

 c. Our Precedent Regarding Standing under HRS § 632-1
 

 Recently, in
 
 Asato v. Procurement Policy Board
 
 ,
 
 132 Hawai'i 333
 
 ,
 
 322 P.3d 228
 
 (2014), we clarified the confusion in our case law regarding whether the three-part "injury in fact" test applies to declaratory judgment lawsuits brought pursuant to HRS § 91-7 under which "any interested person" may seek declaratory relief regarding the validity of administrative rules.
 
 [29]
 
 Analyzing the some
 what confusing pronouncements of our prior case law on the issue, we held that a person seeking a judicial declaration under HRS § 91-7 need not satisfy the three-part "injury in fact" test to qualify as an "interested person" with standing under that statute.
 
 See
 

 Asato
 
 ,
 
 132 Hawai'i at 342-46
 
 ,
 
 322 P.3d at 237-41
 
 . The
 
 Asato
 
 majority noted that in
 
 Life of the Land II
 
 , this court held that plaintiffs whose interests "may have been adversely affected" had standing to request declaratory relief under HRS § 91-7.
 
 Asato
 
 ,
 
 132 Hawai'i at 342
 
 ,
 
 322 P.3d at
 
 237 (citing
 
 Life of the Land II
 
 ,
 
 63 Haw. at 177-78
 
 ,
 
 623 P.2d at
 
 441 ). We also noted that in
 
 Richard v. Metcalf
 
 ,
 
 82 Hawai'i 249
 
 ,
 
 921 P.2d 169
 
 (1996), however, this court appeared to have adopted a more stringent standing standard, requiring that the plaintiff demonstrate an "injury in fact" to have standing under HRS § 91-7.
 
 See
 

 Asato
 
 ,
 
 132 Hawai'i at 342
 
 ,
 
 322 P.3d at
 
 237 (citing
 
 Richard
 
 ,
 
 82 Hawai'i at 253-54
 
 ,
 
 921 P.2d at
 
 173-74 ). We stated:
 

 However, it is not clear how
 
 Richard
 
 reached this conclusion.
 
 Richard
 
 states that it was relying on
 
 Bush [v. Watson
 
 ,
 
 81 Hawai'i 474
 
 , 479,
 
 918 P.2d 1130
 
 , 1135 (1996),
 
 reconsideration denied
 
 ,
 
 82 Hawai'i 156
 
 ,
 
 920 P.2d 370
 
 (1996) ], which, according to
 
 Richard
 
 , "applied the 'injury in fact' test to determine the standing of a party who had filed a declaratory judgment action under HRS § 91-7."
 
 Richard
 
 ,
 
 82 Hawai'i at 253
 
 ,
 
 921 P.2d at 173
 
 . However,
 
 Bush
 
 does not mention either HRS § 91-7 or "[a]ny interested person", or provide any analysis on why the injury in fact test should apply to "[a]ny interested person[s]."
 
 See
 

 Bush
 
 ,
 
 81 Hawai'i at 479
 
 ,
 
 918 P.2d at 1135
 
 .
 

 Id.
 

 We opined that "in the absence of supportive reasoning, it is difficult to accord governing impact to this aspect of
 
 Richard
 
 , particularly where the plain language of HRS § 91-7 and the legislative history of that statute require a different result that is in accord with
 
 Life of the Land [II]
 
 ."
 
 Asato
 
 ,
 
 132 Hawai'i at 343
 
 ,
 
 322 P.3d at 238
 
 (footnote omitted).
 

 The
 
 Asato
 
 majority also addressed the dissent's statement that it had "been well settled that a plaintiff must satisfy the three-part 'injury in fact' test in order to have standing under HRS § 91-7,"
 
 Asato
 
 ,
 
 132 Hawai'i at 362
 
 ,
 
 322 P.3d at 257
 
 (Recktenwald, C.J., dissenting, in which Nakayama, J., joined), by noting
 
 Richard
 
 had not proffered reasoning as to why an "interested person" must meet the "injury in fact" test, despite the fact that it was the first case to adopt that requirement.
 
 Asato
 
 ,
 
 132 Hawai'i at 346
 
 ,
 
 322 P.3d at
 
 241 (citing
 
 Richard
 
 ,
 
 82 Hawai'i at 253-54
 
 ,
 
 921 P.2d at
 
 173-74 ). The majority noted that "
 
 Richard
 
 may have erroneously assumed that the issue had already been resolved in
 
 Bush
 
 ."
 

 Id.
 

 (citing
 
 Richard
 
 ,
 
 82 Hawai'i at 253
 
 ,
 
 921 P.2d at
 
 173 ). We noted that although the doctrine of stare decisis must not be treated lightly, we were "address[ing] an issue that was not well-supported or well-settled."
 
 Asato
 
 ,
 
 132 Hawai'i at 346
 
 ,
 
 322 P.3d at 241
 
 . We also noted that "[s]tanding is a prudential doctrine, and
 
 where no prudential reasons have ever been set forth in support of a particular standing requirement, review of that requirement is warranted, as we do so here
 
 ."
 
 Asato
 
 ,
 
 132 Hawai'i at 346
 
 ,
 
 322 P.3d at
 
 241 (citing
 
 Citizens
 
 , 91 Hawai'i at 100, 979 P.2d at 1126 ) (emphasis added).
 

 Similar to
 
 Asato
 
 , which evaluated our precedent regarding standing to bring a declaratory relief action under HRS § 91-7, as discussed below, our precedent regarding requirements for standing under HRS § 632-1 has also been confusing and has not been well settled. As further discussed below, our cases that have required satisfaction of a three-part "injury in fact" test for HRS § 632-1 standing have not adequately set forth prudential reasons for doing so. Rather, our imposition of a three-part "injury in fact" test to HRS § 632-1 standing actually contravenes prudential considerations regarding the appropriate role of the judiciary within the three branches of government, because the three-part test contradicts the language of HRS § 632-1 and the legislative mandate of HRS § 632-6.
 

 Dalton v. City and County of Honolulu
 
 ,
 
 51 Haw. 400
 
 ,
 
 462 P.2d 199
 
 (1969), appears to be the first reported case in which we expressly addressed standing in the context of a case requesting a declaratory judgment pursuant to HRS § 632-1. We stated:
 

 The standing necessary to pursue a declaratory judgment is described in HRS § 632-1 :
 

 Controversies involving the interpretation of ... statutes, municipal ordinances, and other governmental regulations, may be so determined, and this enumeration does not exclude other instances of actual antagonistic assertion and denial of right.
 

 Relief by declaratory judgment ... may be granted in all civil cases where an actual controversy exists between contending parties, ... or where in any such case the court is satisfied that a party asserts a legal relation, status, right, or privilege in which he has a concrete interest ....
 

 Dalton
 
 ,
 
 51 Haw. at 402-03
 
 ,
 
 462 P.2d at 202
 
 .
 

 In
 
 Dalton
 
 , we held that plaintiffs residing in very close proximity to a proposed high rise apartment building development, which would restrict their scenic view, limit their sense of space, and increase population density, clearly had standing to bring an HRS § 632-1 declaratory relief action because they had a "concrete interest" in a "legal relation" and because the case was an "actual controversy," not merely a hypothetical problem.
 
 Dalton
 
 ,
 
 51 Haw. at 403
 
 ,
 
 462 P.2d at 202
 
 . There was no reference in
 
 Dalton
 
 to a three-part "injury in fact" test for standing.
 
 [30]
 

 Twenty-two years after
 
 Dalton
 
 ,
 
 Life of the Land II
 
 also briefly discussed HRS § 632-1 declaratory relief standing.
 
 See
 

 Life of the Land II
 
 ,
 
 63 Haw. at 178
 
 ,
 
 623 P.2d at 442
 
 . We stated:
 

 Standing is that aspect of justiciability focusing on the party seeking a forum rather than on the issues he wants adjudicated. And the crucial inquiry in its determination is "whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of ... (the court's) jurisdiction and to justify exercise of the court's remedial powers on his behalf."
 
 While standing requisites ordinarily comprise one of the "prudential rules" discussed earlier, they may also be tempered, or even prescribed, by legislative and constitutional declarations of policy.
 

 [5]
 

 5
 
 See, e.g.
 
 , HRS Chapter 632, Declaratory Judgments, and Hawaii State Constitution, Article XI, Section 9, Environmental Rights....
 

 Life of the Land II
 
 ,
 
 63 Haw. at
 
 172 & n.5,
 
 623 P.2d at
 
 438 & n.5 (quoting
 
 Warth v. Seldin
 
 ,
 
 422 U.S. 490
 
 , 498-99,
 
 95 S.Ct. 2197
 
 ,
 
 45 L.Ed.2d 343
 
 (1975) ). In
 
 Life of the Land II
 
 , we discussed the liberalization of standing requirements in federal court environmental cases, in which the courts had shifted from the "legal right" to the "injury in fact" standard to evaluate standing.
 
 Life of the Land II
 
 ,
 
 63 Haw. at 174
 
 ,
 
 623 P.2d at 439
 
 .
 
 [31]
 
 We also stated:
 

 While the term "injury in fact" may not appear in their text, our decisions have afforded standing on a basis at least coextensive with federal doctrine where harm to such interests has been alleged.
 
 This is not to suggest our standing requisites will follow every twist or turn in the development of federal doctrine. Our touchstone remains "the needs of justice."
 

 63 Haw. 166
 
 ,
 
 623 P.2d at 441
 
 (emphasis added) (citation omitted). We further stated in footnote 6:
 

 The Supreme Court's standing doctrine includes a requirement that there be a showing of a "logical nexus" between the interest asserted and the claim sought to be adjudicated.
 
 See
 

 Flast v. Cohen
 
 ,
 
 392 U.S. 83
 
 , 102 [
 
 88 S.Ct. 1942
 
 ,
 
 20 L.Ed.2d 947
 
 ] (1968). In
 
 Duke Power Co. v. Carolina Environmental Study Group, Inc.
 
 ,
 
 438 U.S. 59
 
 [
 
 98 S.Ct. 2620
 
 ,
 
 57 L.Ed.2d 595
 
 ] (1978), the Court summarized its doctrine as follows:
 

 The essence of the standing inquiry is whether the parties seeking to invoke the court's jurisdiction have "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions."
 
 Baker v. Carr
 
 ,
 
 369 U.S. 186
 
 , 204 [
 
 82 S.Ct. 691
 
 ,
 
 7 L.Ed.2d 663
 
 ] (1962). As refined by subsequent reformulation, this requirement of a "personal stake" has come to be understood to require not only a "distinct and palpable injury," to the plaintiff,
 
 Warth v. Seldin
 
 ,
 
 422 U.S. 490
 
 , 501 [
 
 95 S.Ct. 2197
 
 ,
 
 45 L.Ed.2d 343
 
 ] (1975), but also a "fairly traceable" causal connection between the claimed injury and the challenged conduct.
 
 Arlington Heights v. Metropolitan Hous. Dev. Corp.
 
 ,
 
 429 U.S. 252
 
 , 261 [
 
 97 S.Ct. 555
 
 ,
 
 50 L.Ed.2d 450
 
 ] (1977).
 
 See
 

 also
 

 Simon v. E. Ky. Welfare Rights Org.
 
 ,
 
 426 U.S. 26
 
 , 41-42 [
 
 96 S.Ct. 1917
 
 ,
 
 48 L.Ed.2d 450
 
 ] (1976) ;
 
 Linda R. S. v. Richard D.
 
 ,
 
 410 U.S. 614
 
 , 617 [
 
 93 S.Ct. 1146
 
 ,
 
 35 L.Ed.2d 536
 
 ] (1973).
 

 438 U.S. at 72
 
 [
 
 98 S.Ct. 2620
 
 ]. However, it went on to state the requirement of the foregoing nexus was only applicable in taxpayers' suits and "outside the context of ... (such) suits, a litigant must demonstrate ... (nothing) more than injury in fact and a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury to satisfy the 'case or controversy' requirement of Art. III."
 

 Id.
 

 at 79
 
 [
 
 98 S.Ct. 2620
 
 ].
 

 Life of the Land II
 
 ,
 
 63 Haw. at
 
 173 n.6,
 
 623 P.2d at
 
 439 n.6.
 

 Thus, in
 
 Life of the Land II
 
 , we referred to the term "injury in fact" as a concept that loosened, not tightened, standing requirements under HRS § 91-7. We also made clear that our standing requirements would not necessarily follow federal standards, but would instead be based on the "needs of justice."
 
 63 Haw. at 176
 
 ,
 
 623 P.2d at 441
 
 . We noted that even under federal standing requirements existing at that time, components of the three-part "injury in fact" test applied only in taxpayers' suits.
 
 63 Haw. at
 
 173 n.6,
 
 623 P.2d at
 
 439 n.6. In any event,
 
 Life of the Land II
 
 actually analyzed standing under HRS § 91-7. With respect to HRS § 632-1 standing, we merely stated as follows:
 

 HRS § 632-1 authorizes courts of record to issue declaratory judgments "in cases of actual controversy." Our brief discourse on the "prudential rules" and their application to this case has obviated a necessity for further debate on whether an "actual controversy" exists.
 

 Life of the Land II
 
 ,
 
 63 Haw. at 178
 
 ,
 
 623 P.2d at 442
 
 (footnote omitted). As can be seen, in
 
 Life of the Land II
 
 , we analyzed HRS § 632-1 standing based on the "actual controversy" language of the statute, and we did not actually apply an "injury in fact" requirement to HRS § 632-1.
 

 Later, in
 
 Citizens
 
 , we pointed out the difference between standing requirements for HRS § 91-14 agency appeals and HRS § 632-1 declaratory judgment actions, and stated:
 

 Citizens first contends that the circuit court erred in concluding that it did not establish an injury in fact nor raise a genuine issue of material fact relating to the existence of an injury in fact. Likewise, as noted above, Chalon describes the issue of Citizens' standing in terms of proving an injury in fact sufficient to invoke a contested case hearing. These arguments wholly misapprehend and blur the distinction between standing to participate in a contested case hearing under HRS § 91-14 and standing in an action for declaratory relief under HRS § 632-1 (1993).
 

 As a general rule, standing is the aspect of justiciability focusing on the party seeking a forum rather than on the issues he wants adjudicated. In order for individuals or groups legitimately to invoke contested case hearing procedures on SMA permit applications before the State Land Use Commission (LUC), they must be "directly and immediately affected by the Commission's decision." HPC Rule 4-2(6)(B). In
 
 PASH
 
 , we stated that this requires a party to demonstrate that its interests were injured. The demonstration is evaluated via a three-part "injury in fact" test requiring: "(1) an
 
 actual
 
 or
 
 threatened
 
 injury, which, (2) is traceable to the challenged action, and (3) is likely to be remedied by favorable judicial action."
 

 On the other hand, for the purposes of establishing standing in an action for declaratory relief, HRS § 632-1 interposes less stringent requirements for access and participation in the court process. As this court explained in Richard v. Metcalf,
 
 82 Hawai'i 249
 
 , 254 n.12,
 
 921 P.2d 169
 
 , 174 n.12 (1996),
 

 Although HRS § 632-1 provides for standing to sue "in cases of actual controversy," HRS § 632-6 clarifies that the purpose of HRS chapter 632 is to afford relief without requiring one of the parties interested so to invade the rights asserted by the other as to entitle the party to maintain an ordinary action therefor. It is to be liberally interpreted and administered, with a view to making the courts more serviceable to the people.
 

 91 Hawai'i at 99-100, 979 P.2d at 1125-26 (footnotes and brackets omitted, some internal citations and quotation marks omitted) (emphases added).
 

 In
 
 Citizens
 
 , we did refer to the plaintiff organization's "injury in fact" in analyzing its standing, stating that "although Citizens' members are neither owners nor adjoining owners of the Mahukona project, they nonetheless alleged an injury in fact sufficient to constitute standing to participate in a declaratory judgment action."
 
 Citizens
 
 , 91 Hawai'i at 101, 979 P.2d at 1127. We were clear, however, that the three-part "injury in fact" test did not govern standing for HRS § 632-1 declaratory judgment actions, noting that "injury to its members' quality of life is threatened," and concluding that "Citizens asserts personal and special interests sufficient to invoke judicial resolution under HRS § 632-1."
 
 Id.
 

 [32]
 
 The concept of "personal" and "special" interests sufficient for standing mentioned in
 
 Citizens
 
 had actually been developed to define what constitutes a "person aggrieved" under HRS § 91-14 with standing to request judicial review of contested cases pursuant to that statute.
 
 See, e.g.
 
 ,
 
 Life of the Land, Inc. v. Land Use Comm'n
 
 ,
 
 61 Haw. 3
 
 , 8,
 
 594 P.2d 1079
 
 , 1082 (1979) ;
 
 Life of the Land II
 
 ,
 
 63 Haw. at 176
 
 ,
 
 623 P.2d at
 
 440-41 ;
 
 Mahuiki v. Planning Comm'n
 
 ,
 
 65 Haw. 506
 
 , 515,
 
 654 P.2d 874
 
 , 880 (1982) ;
 
 Ka Pa'akai O Ka 'Aina v. Land Use Comm'n
 
 ,
 
 94 Hawai'i 31
 
 , 42-43,
 
 7 P.3d 1068
 
 , 1079-80 (2000). Therefore, it appears that in
 
 Citizens
 
 , we juxtaposed the "personal and special interests" requirement for a "person aggrieved" to have standing under HRS § 91-14 to an HRS § 632-1 declaratory relief action.
 

 Then, in the 2001
 
 Mottl
 
 case,
 
 95 Hawai'i 381
 
 ,
 
 23 P.3d 716
 
 , we again acknowledged liberalized standing requirements for HRS § 632-1 declaratory judgment actions, but then applied the three-part "injury in fact" test for standing under that statute. In
 
 Mottl
 
 , we addressed whether the University of Hawai'i Professional Assembly and some of its members had standing to bring an HRS § 632-1 declaratory relief lawsuit asserting that the State of Hawai'i wrongfully reduced the University of Hawaii's allotment of appropriated funds.
 
 [33]
 
 We began our standing analysis by stating:
 

 It is well settled that the crucial inquiry with regard to standing is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his or her invocation of the court's jurisdiction and to justify exercise of the court's remedial powers on his or her behalf.
 
 In deciding whether the plaintiff has the requisite interest in the outcome of the litigation, we employ a three-part test
 
 : (1) has the plaintiff suffered an actual or threatened injury as a result of the defendant's wrongful conduct; (2) is the injury fairly traceable to the defendant's actions; and (3) would a favorable decision likely provide relief for plaintiff's injury.
 

 ....
 

 On the other hand, for the purposes of establishing standing in an action for declaratory relief, HRS § 632-1 interposes less stringent requirements for access and participation in the court process.
 
 As this court explained in
 
 Richard v. Metcalf
 
 ,
 
 82 Hawai'i 249
 
 , 254 n.12,
 
 921 P.2d 169
 
 , 174 n.12 (1996),
 

 although HRS § 632-1 provides for standing to sue in cases of actual controversy, HRS § 632-6 (1993) clarifies that the purpose of HRS chapter 632 is to afford relief without requiring one of the parties interested so to invade the rights asserted by the other as to entitle the party to maintain an ordinary action therefor. It is to be liberally interpreted and administered, with a view to making the courts more serviceable to the people
 
 .
 

 Mottl
 
 ,
 
 95 Hawai'i at 389
 
 ,
 
 23 P.3d at 724
 
 (some internal quotation marks, ellipses, footnotes, brackets, and citations omitted) (emphases added).
 

 In
 
 Mottl
 
 , we applied the three-part "injury in fact" test to HRS § 632-1 standing for the first time, and we ruled that the plaintiffs did not meet its requirements.
 
 See
 

 Mottl
 
 ,
 
 95 Hawai'i at 395
 
 ,
 
 23 P.3d at 730
 
 . After
 
 Mottl
 
 , a few opinions have expressly required plaintiffs to satisfy the three-part "injury in fact" test to establish standing in HRS § 632-1 declaratory judgment lawsuits.
 
 See, e.g.
 
 ,
 
 Cty. of Kaua'i ex rel. Nakazawa v. Baptiste
 
 ,
 
 115 Hawai'i 15
 
 , 26,
 
 165 P.3d 916
 
 , 927 (2007) ;
 
 Ala Loop Homeowners
 
 , 123 Hawai'i at 440-41, 235 P.3d at 1152-53.
 

 As in our adoption of the three-part "injury in fact" test in the context of HRS § 91-7 standing, discussed in
 
 Asato
 
 , it is unclear why we adopted the test for HRS § 632-1 standing in
 
 Mottl
 
 . Similar to the confusion in our case law regarding standing requirements for HRS § 91-7 that we clarified in
 
 Asato
 
 , our case law regarding standing requirements for HRS § 632-1 declaratory judgment actions has also been unsettled and confusing.
 
 [34]
 
 We therefore now clarify standing requirements for a declaratory judgment lawsuit under HRS § 632-1.
 

 d. Standing Requirements under HRS § 632-1(b)
 

 As discussed in Section IV.C.3.a, standing in Hawai'i state courts is a prudential doctrine in which our courts are directed to "weigh the wisdom, efficacy, and timeliness
 of an exercise of their power before acting, especially where there may be an intrusion into areas committed to other branches of government."
 
 Life of the Land II
 
 ,
 
 63 Hawai'i at 172
 
 ,
 
 623 P.2d at 438
 
 . To reiterate, we have noted that standing requirements may be tempered, or even prescribed, by legislative declarations of policy.
 
 See
 

 id.
 

 In HRS §§ 632-1 and 632-6, the legislature has declared its policy regarding standing, and has expressed its view regarding the "proper - and properly limited - role of [our] courts[,]"
 
 Yamasaki
 
 ,
 
 69 Haw. at 171
 
 ,
 
 737 P.2d 446
 
 (citation omitted), with respect to declaratory judgment actions under HRS Chapter 632.
 

 As discussed in Section IV.C.3.b, the language of HRS § 632-1 provides that declaratory relief is available in civil cases (1) where there is an actual controversy between contending parties;
 
 or
 
 (2) (a) where antagonistic claims exist between the parties (i) that indicate imminent and inevitable litigation, or (ii) where the party seeking declaratory relief has a concrete interest in a legal relation, status, right, or privilege that is challenged or denied by the other party, who has or asserts a concrete interest in the same legal relation, status, right, or privilege; and (b) a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding.
 

 As further discussed in Section IV.C.3.b, the language of HRS § 632-1(b) would seemingly allow for declaratory relief in civil cases where there is an "actual controversy"
 
 or
 
 "antagonistic claims" between contending parties. We first address the meaning of "actual controversy."
 

 As noted in
 
 Kaleikau v. Hall
 
 ,
 
 27 Haw. 420
 
 (Haw. Terr. 1923), Hawai'i's Declaratory Judgment Act, enacted in 1921, was copied in toto from the declaratory judgment act of Kansas.
 
 Kaleikau
 
 ,
 
 27 Haw. at 426
 
 . The Kansas Supreme Court first addressed its declaratory judgment act in
 
 State ex rel. Hopkins v. Grove
 
 ,
 
 109 Kan. 619
 
 ,
 
 201 P. 82
 
 (1921). The Kansas Supreme Court noted that its statute was explicitly limited in its operation to cases of "actual controversy."
 
 Grove
 
 ,
 
 201 P. at 83
 
 . In addressing what constituted an "actual controversy," the court stated:
 

 Against the validity of the statute it is urged that the occasion for judicial action cannot arise until a claim is made that an actual wrong has been done or is immediately threatened, and, moreover (what is much the same thing stated in another way), that a decision cannot properly be classed as a judgment, as strictly judicial act, unless, besides determining the merits of the controversy between the parties, deciding which is right, it affords (or denies) some additional remedy--in other words "consequential relief"--and therefore that power to decide a controversy in the absence of the conditions indicated is not judicial and cannot be conferred upon courts by the Legislature. This view appears to us to be unsound, and to be the result of confusing declaratory judgments with advisory opinions and decisions in moot cases, and perhaps also of an inclination to treat a general practice that has been long established as having acquired the force of a constitutional guaranty. A mere advisory opinion upon an abstract question is obviously not a judgment at all, since there are no parties to be bound, and the rights of no one are directly affected. The situation is substantially the same where opposing parties present a moot question--one the decision of which can have no practical effect. Where a judgment is sought of such character as to be of no benefit unless accompanied by an order the carrying out of which is impossible, the futility of the proceeding is a sufficient basis for a court's refusal to entertain it, whether or not jurisdiction to do so exists. But some judgments are wholly or in part self-operative. They perform a valuable function in and of themselves. It is often said that a cause of action arises only upon the breach of a duty--the invasion of a right. This, however, is merely the announcement of a general rule of practice subject to possible exceptions and to legislative change....
 

 201 P. at 84
 
 .
 

 Thus, the Kansas Supreme Court indicated that an "actual controversy" under the Kansas declaratory judgment act (which Hawai'i copied in its entirety) did not require additional
 "consequential relief," but could not be an "advisory opinion" upon an abstract question or that involved a "moot" case, for which a declaratory judgment would have no practical effect. Therefore, at the time of the enactment of Hawai'i's declaratory judgment act, it appears an "actual controversy" was one that that did not lack justiciability based on the "advisory opinion" prohibition or "mootness" prongs of justiciability concerns. Much later, in
 
 Life of the Land II
 
 , we indicated that an "actual controversy" was one that generally satisfied prudential rules of self-governance, including "standing."
 
 Life of the Land II
 
 ,
 
 63 Haw. at 171-78
 
 ,
 
 623 P.2d at 437-42
 
 .
 

 Accordingly, the first prong of HRS § 632-1(b) allowing for declaratory relief in a case of "actual controversy" between contending parties merely mandates that prudential requirements, including standing, be satisfied, but does not set out any actual standing requirements.
 

 In the second prong of HRS § 632-1(b), however, the legislature has expressed its policy and has expressed its view regarding the "proper - and properly limited - role of [our] courts" - by providing that a party has standing to bring an action for declaratory relief in a civil case (1) where antagonistic claims exist between the parties (i) that indicate imminent and inevitable litigation, or (ii) where the party seeking declaratory relief has a concrete interest in a legal relation, status, right, or privilege that is challenged or denied by the other party, who has or asserts a concrete interest in the same legal relation, status, right, or privilege; and (2) a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding.
 

 The Chief Justice's Dissent acknowledges that "[w]hen the bill that enacted HRS §§ 632-1 and 632-6 was first introduced in 1921, the Senate Committee on the Judiciary explained that its purpose was to provide 'parties in dispute' a judicial determination of rights 'before a cause of action accrues by breach of such rights by either party.' " Dissenting Opinion by Recktenwald, C.J. (citing S. Stand. Comm. Rep. No. 263, in 1921 Senate Journal, at 616). Consistent with this purpose, the plain language of HRS § 632-1 does not require satisfaction of a three-part "injury in fact" test for a party to have standing.
 
 [35]
 
 Imposition of this additional requirement when standing requirements of HRS § 632-1 have otherwise been met limits the availability of declaratory relief in our state courts. Thus, imposition of an additional "injury in fact" requirement contravenes the legislature's specific declaration of policy regarding HRS § 632-1 standing as well as its general declaration of policy under HRS § 632-6 that Chapter 632 "be liberally interpreted and administered, with a view to making the courts more serviceable to the people." Requiring satisfaction of an additional "injury in fact" test for standing under HRS § 632-1 contravenes prudential considerations of the "proper - and properly limited - role of courts."
 

 To summarize, restricting standing by imposing standing requirements that do not exist in the language of HRS § 632-1, despite the express intent of the legislature, is antithetical to prudential considerations. As stated by the United States Supreme Court, courts "cannot limit a cause of action that [the legislature] has created merely because 'prudence' dictates."
 

 Lexmark Int'l, Inc. v. Static Control Components, Inc.
 
 ,
 
 572 U.S. 118
 
 , 128,
 
 134 S.Ct. 1377
 
 ,
 
 188 L.Ed.2d 392
 
 (2014).
 
 [36]
 

 We therefore hold that a party has standing to seek declaratory relief in a civil case brought pursuant to HRS § 632-1 (1) where antagonistic claims exist between the parties (a) that indicate imminent and inevitable litigation, or (b) where the party seeking declaratory relief has a concrete interest in a legal relation, status, right, or privilege that is challenged or denied by the other party, who has or asserts a concrete interest in the same legal relation, status, right, or privilege; and (2) a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding.
 

 Our holding is consistent with standing requirements set out by the legislature through the language of the statute. The common law three-part "injury in fact" test is simply inconsistent with HRS Chapter 632. For example, the first prong of the three-part "injury in fact" test for standing requires a showing that "the plaintiff has suffered an actual or threatened injury as a result of the defendant's conduct." This is a greater showing than required by HRS § 632-1(b), which does not require an "actual or threatened injury." The second prong of the three-part "injury in fact" test requires a showing that "the injury is fairly traceable to the defendant's actions," a requirement that also does not exist under the language of HRS § 632-1(b). The third prong of the "injury in fact" test is also more stringent, as it requires a showing that "a favorable decision would likely provide relief for the plaintiff's injury," rather than a showing that a declaratory judgment will serve to terminate the uncertainty or controversy. The third prong also clearly violates the language of HRS § 632-1(a), which provides that declaratory relief may be sought whether or not consequential relief could be claimed.
 
 [37]
 

 Finally, our holding regarding the requirements for standing under HRS § 632-1 is consistent with the "less stringent requirements for access and participation in the court process" under HRS § 632-1, and recognizes that "[o]ur touchstone remains the 'needs of justice.' "
 
 Life of the Land II
 
 ,
 
 63 Haw. at 176
 
 ,
 
 623 P.2d at 441
 
 (citation omitted).
 
 [38]
 

 e. Tax Foundation Has Standing under HRS § 632-1
 

 Applying the standing requirements delineated above to the facts of this case, we hold that Tax Foundation has HRS § 632-1 standing as: (1) (a) antagonistic claims exist between Tax Foundation and the State with respect to whether HRS § 248-2.6 (1993 & Supp. 2005) requires additional amounts from its rail surcharge payments be paid over to HART; and, under prong (ii), based on its
 historical purpose as a governmental financial accountability watchdog, Tax Foundation has a concrete interest in an alleged right to have additional amounts from its rail surcharge payments paid over to HART pursuant to HRS § 248-2.6 (1993 & Supp. 2005), an alleged right challenged or denied by the State, which has or also asserts a concrete interest in the right to keep those additional amounts; and (2) a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding. In fact, the uncertainty or controversy is now terminated through the majority opinion on the merits in favor of the State.
 
 See
 
 Opinions of the Court Parts One and Three.
 
 [39]
 

 PART THREE
 

 (By: Recktenwald, C.J., with whom McKenna, Pollack, and Wilson, JJ., join)
 

 D. The State's Application of HRS § 248-2.6 is Proper
 

 Having determined that Tax Foundation has standing as a taxpayer to bring suit, we now consider the merits of its challenge.
 
 [40]
 

 The parties dispute whether the plain language of HRS § 248-2.6 expressly requires the State to retain 10% of the Honolulu County surcharge, as the State contends, or whether the State is required to retain only those costs it actually incurs in its administration of the surcharge, as Tax Foundation contends.
 

 HRS § 248-2.6 provides in relevant part:
 

 (a) ... Out of the revenues generated by county surcharges on state tax paid into each respective state treasury special account or the mass transit special fund, the director of finance shall deduct ten per cent of the gross proceeds of a respective county's surcharge on state tax to reimburse the State for the costs of assessment, collection, disposition, and oversight of the county surcharge on state tax incurred by the State. Amounts retained shall be general fund realizations of the State.
 

 (b) The amounts deducted for costs of assessment, collection, disposition, and oversight of county surcharges on state tax shall be withheld from payment to the counties by the State out of the county surcharges on state tax collected for the current calendar year.
 

 (c) For the purpose of this section, the costs of assessment, collection, disposition, and oversight of the county surcharges on state tax shall include any and all costs, direct or indirect, that are deemed necessary and proper to effectively administer this section and sections 237-8.6 and 238-2.6.
 

 (d) For a county with a population equal to or less than five hundred thousand that adopts a county surcharge on state tax, after the deduction and withholding of the costs under subsections (a) and (b), the director of finance shall pay the remaining balance on a quarterly basis to the director of finance of each county that has adopted a county surcharge on state tax under section 46-16.8....
 

 HRS § 248-2.6.
 

 It is well-established that:
 

 [W]here there is no ambiguity in the language of a statute, and the literal application of the language would not produce an absurd or unjust result, clearly inconsistent with the purposes and policies of the statute, there is no room for judicial construction and interpretation, and the statute must be given effect according to its plain and obvious meaning.
 

 State v. Palama
 
 ,
 
 62 Haw. 159
 
 , 161,
 
 612 P.2d 1168
 
 , 1170 (1980).
 

 Additionally, "courts are bound, if rational and practicable, to give effect to all parts of a statute, and that no clause, sentence, or word shall be construed as superfluous, void, or insignificant if a construction can be legitimately found which will give force to and preserve all the words of the statute."
 
 Camara v. Agsalud
 
 ,
 
 67 Haw. 212
 
 , 215-216,
 
 685 P.2d 794
 
 , 797 (1984).
 

 Tax Foundation argues that HRS § 248-2.6 requires the State's initial 10% deduction to be reduced by the costs specified in subsection (c), and that the State must remit the remaining balance back to the City and County of Honolulu. Whether subsection (c) requires a calculation of actual costs, when viewed in isolation, is ambiguous. However, when viewed in context with the rest of the statute, the scope of subsection (c) becomes clear. Nothing in the remaining portions of HRS § 248-2.6 suggests a requirement to engage in such a calculation and reimbursement. There is no language in the statute that establishes a procedure for remitting the funds in excess of the State's withholding. Beyond stating that "[a]mounts retained shall be general fund realizations of the State[,]" the text of HRS § 248-2.6 does not contemplate any other manner of the disposition of the 10% deduction.
 

 The language of HRS § 248-2.6 expressly requires that the State retain 10% of the surcharge proceeds, and a literal application of the statute's language does not produce an absurd or unjust result. HRS § 248-2.6(a) provides that the State "shall deduct ten per cent ... to reimburse the State for the costs of assessment...." Subsections (b) and (d) prescribe the timing and payment of the surcharge balance to the counties, and (c) explains the broad range of costs contemplated by the legislature in determining that 10% was an appropriate retention. This construction of HRS § 248-2.6(a) does not render the remaining subsections superfluous, void, or insignificant, as contended by Tax Foundation. Nor is this application of the language clearly inconsistent with the purpose of reimbursing the State for the costs of assessment, collection, disposition, and oversight of the county surcharge.
 

 The legislative history of Act 247 also supports the interpretation that HRS § 248-2.6 requires the State to retain 10% of surcharge proceeds. Prior to its final amendment in conference committee, the bill that eventually became HRS § 248-2.6(a) contained the following language regarding the State's retention of costs:
 

 [T]he director of finance
 
 shall retain, from time to time, sufficient amounts
 
 to reimburse the State for the costs of assessment, collection, and disposition of the county surcharge on state tax incurred by the State ....
 

 H.B. 1309, H.D. 2, S.D. 2, 23rd Leg., Reg. Sess. (2005) (emphasis added),
 
 available at
 
 https://www.capitol.hawaii.gov/session2005/bills/HB1309_SD2_.htm.
 

 The conference committee amended this subsection to its current form, which states:
 

 [T]he director of finance
 
 shall deduct ten per cent of the gross proceeds of a respective county's surcharge on state tax
 
 to reimburse the State for the costs of assessment, collection, and disposition of the county surcharge on state tax incurred by the State.
 

 Conf. Comm. Rep. No. 186, in 2005 House Journal, at 1829; 2005 Senate Journal, at 1092; 2005 Haw. Sess. Laws Act 247, § 5 at 773 (emphasis added).
 

 The legislative history therefore reflects the legislature's intent to set the costs at 10% instead of requiring the State to calculate, "from time to time, sufficient amounts" to reimburse itself for the costs of the surcharge's administration. Accordingly, we conclude that HRS § 248-2.6 requires the State to retain 10% of the surcharge's gross proceeds.
 

 E. HRS § 248-2.6 Survives Constitutional Scrutiny
 

 1. HRS § 248-2.6 Does Not Violate the Equal Protection Clauses of the Hawai'i or U.S. Constitutions
 

 Tax Foundation argues that the State's interpretation of HRS § 248-2.6 violates
 the equal protection clauses of the state and federal constitutions.
 
 See
 
 Haw. Const. art. I, § 5 ; U.S. Const. amend. XIV. "[T]he equal protection clauses of the United States and Hawai'i Constitutions mandate that all persons similarly situated shall be treated alike[.]"
 
 DW Aina Lea Development, LLC v. Bridge Aina Lea, LLC.
 
 ,
 
 134 Hawai'i 187
 
 , 218,
 
 339 P.3d 685
 
 , 716 (2014) (quotation marks and brackets omitted). "Equal protection jurisprudence has typically been concerned with governmental classifications that affect some groups of citizens differently than others."
 

 Id.
 

 (quotation marks and brackets omitted). It is well-established that "unless fundamental rights or suspect classifications are implicated, we will apply the rational basis standard of review in examining a denial of equal protection claim."
 
 KNG Corp. v. Kim
 
 ,
 
 107 Hawai'i 73
 
 , 82,
 
 110 P.3d 397
 
 , 406 (2005) (quoting
 
 Sandy Beach Def. Fund v. City Council
 
 ,
 
 70 Haw. 361
 
 , 380,
 
 773 P.2d 250
 
 , 262 (1989) ) (emphasis omitted). The rational basis standard of review applies here because Tax Foundation does not allege that either a fundamental right or a suspect classification is implicated.
 
 [41]
 

 Under rational basis review, "[t]he test of constitutionality is whether that statute has a rational relation to a legitimate state interest."
 
 Maeda v. Amemiya
 
 ,
 
 60 Haw. 662
 
 , 669,
 
 594 P.2d 136
 
 , 141 (1979) (citations omitted). The party challenging the constitutionality of a statutory classification has the burden of showing that the classification is not rationally related to its statutory purpose.
 
 Sandy Beach Def. Fund
 
 ,
 
 70 Haw. at 380
 
 ,
 
 773 P.2d at 262
 
 . Furthermore, the rational basis standard "is especially deferential in the context of classifications made by complex tax laws. [I]n structuring internal taxation schemes the States have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation."
 
 Nordlinger v. Hahn
 
 ,
 
 505 U.S. 1
 
 , 11,
 
 112 S.Ct. 2326
 
 ,
 
 120 L.Ed.2d 1
 
 (1992) (citations omitted).
 

 Applying these principles here, the State's collection of 10% of the surcharge's gross proceeds pursuant to HRS § 248-2.6 is rational. The State's legitimate interest is in reimbursing itself for the costs incurred in its administration of the surcharge. The State's 10% retention of the surcharge's gross proceeds is rationally related to this interest because in 2005, it was uncertain what the potential burden of the surcharge's administration would be, and it was reasonable for the State to estimate administration costs at 10% of the surcharge's gross proceeds. The purpose of the 10% retention under HRS § 248-2.6(a), to reimburse the State for its costs, was served because costs were incurred as a result of administering the surcharge. Beyond this stated purpose, it is also rational for Honolulu taxpayers to bear an increased tax burden to further a state interest in mitigating increased burdens on State services incurred by State agencies due to the implementation of the mass transit rail system, the use and benefit of which the City and County of Honolulu alone receives.
 

 Accordingly, the State's retention of 10% of the surcharge's gross proceeds has a rational relation to the purpose of reimbursing the State for the cost of administering the surcharge. HRS § 248-2.6 therefore does not violate the protections guaranteed by the equal protection clauses of the Hawai'i or United States Constitutions.
 

 2. HRS § 248-2.6 Does Not Violate the General Laws Provision of the Hawai
 
 '
 
 i Constitution
 

 Tax Foundation also argues that the State's application of HRS § 248-2.6 is unconstitutional because it violates the general
 laws provision of the Hawai'i Constitution, found in Article VIII, § 1. That provision states:
 

 The legislature shall create counties, and may create other political subdivisions within the State, and provide for the government thereof. Each political subdivision shall have and exercise such powers as shall be conferred under general laws.
 

 Haw. Const. art. VIII, § 1.
 

 General laws, as used in Article VIII, § 1, are laws that:
 

 apply uniformly throughout all political subdivisions of the State. But a law may apply to less than all of the political subdivisions and still be a general law, if it applies uniformly to a class of political subdivisions, which, considering the purpose of the legislation, are distinguished by sufficiently significant characteristics to make them a class by themselves.
 

 Bulgo v. County. of Maui
 
 ,
 
 50 Haw. 51
 
 , 58,
 
 430 P.2d 321
 
 , 326 (1967).
 

 Act 247 applies uniformly to all political subdivisions of the state because each county is given the opportunity to adopt the surcharge.
 
 See
 
 HRS § 46-16.8(a) ("Each county may establish a surcharge on state tax ...."). Any county that does so is subject to a withholding by the State of 10% of the gross proceeds of the surcharge as provided in HRS § 248-2.6. The fact that the City and County of Honolulu is the only county that has adopted the surcharge does not change the fact that HRS § 248-2.6 applies uniformly to all Hawai'i taxpayers who live in counties that have opted in and adopted the surcharge. Whether the statute requires the State to retain 10% of the surcharge's gross proceeds or retain only its actual costs similarly does not change the fact that each county is treated the same with respect to the disposition of those proceeds. Accordingly, the State's interpretation of HRS § 248-2.6 does not violate the General Laws provision of our constitution.
 

 V. Conclusion
 

 For the foregoing reasons, we vacate the circuit court's order and judgment granting the State's motion to dismiss for lack of subject matter jurisdiction. Because we conclude that the State's application of HRS § 248-2.6 is consistent with the statute's plain language and legislative intent, and that HRS § 248-2.6 does not violate the state or federal constitutions, we remand this case to the circuit court with instructions to grant the State's motion for summary judgment.
 

 DISSENTING OPINION BY RECKTENWALD, C.J.
 

 I respectfully dissent from the Majority's holding in Part Two. While I conclude that Tax Foundation has standing to pursue declaratory and injunctive relief in this case, I disagree that HRS § 632-1 establishes standing criteria.
 

 1. General Principles of Standing Apply in this Case
 

 Giving due consideration to our courts' "proper and properly limited role" in our governmental system, "judicial intervention in a dispute is normally contingent upon the presence of a 'justiciable' controversy."
 
 Life of the Land v. Land Use Comm'n
 
 (
 
 Life of the Land II
 
 ),
 
 63 Haw. 166
 
 , 172,
 
 623 P.2d 431
 
 , 438 (1981) (citation omitted). To be justiciable, a controversy must involve "questions capable of judicial resolution and presented in an adversary context."
 

 Id.
 

 The party seeking a judicial forum must also have standing.
 
 See
 

 id.
 

 ("Standing is that aspect of justiciability focusing on the party seeking a forum rather than on the issues he wants adjudicated.");
 
 Sierra Club v. Morton
 
 ,
 
 405 U.S. 727
 
 , 731-32,
 
 92 S.Ct. 1361
 
 ,
 
 31 L.Ed.2d 636
 
 (1972) ("[T]he question of standing to sue" refers to "[w]hether a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy").
 

 The "crucial inquiry" in determining standing "is 'whether the plaintiff has "alleged such a personal stake in the outcome of the controversy" as to warrant his invocation of ... [the court's] jurisdiction and to justify exercise of the court's remedial powers on his behalf.' "
 
 Life of the Land II
 
 ,
 
 63 Haw. at 172
 
 ,
 
 623 P.2d at 438
 
 (quoting
 
 Warth v. Seldin
 
 ,
 
 422 U.S. 490
 
 , 498-99,
 
 95 S.Ct. 2197
 
 ,
 
 45 L.Ed.2d 343
 
 (1975) ).
 

 We determine whether a plaintiff has alleged a "personal stake in the outcome of the controversy" sufficient to confer standing by asking: "(1) has the plaintiff suffered an actual or threatened injury ...; (2) is the injury fairly traceable to the defendant's actions; and (3) would a favorable decision likely provide relief for plaintiff's injury."
 

 Corboy v. Louie
 
 ,
 
 128 Hawai'i 89
 
 , 104,
 
 283 P.3d 695
 
 , 710 (2011) (quoting
 
 Sierra Club v. Dep't of Trans.
 
 (
 
 Superferry I
 
 ),
 
 115 Hawai'i 299
 
 , 319,
 
 167 P.3d 292
 
 , 312 (2007) ).
 

 When "assessing whether a plaintiff has standing to sue" under the three-prong test, it is "[o]f critical importance" to identify "the nature of the injury alleged" or "the theory of injury presented by the plaintiff."
 
 Superferry I
 
 ,
 
 115 Hawai'i at 321
 
 ,
 
 167 P.3d at
 
 314 (citing
 
 Cmty. Treatment Ctrs. v. City of Westland
 
 ,
 
 970 F.Supp. 1197
 
 , 1208 (E.D. Mich. 1997) ("[T]he resolution of a standing question often depends on how the court characterizes the alleged injury.")). We have noted that "although a plaintiff may be injured in any number of ways, the injury prong of the standing inquiry requires an assertion of a judicially-cognizable injury, that is, a harm to some legally-protected interest."
 

 Id.
 

 Thus, to establish a personal stake in the controversy and its outcome, a plaintiff must assert an injury, or threatened injury, to a judicially cognizable interest.
 
 See
 

 Hawaii's Thousand Friends v. Anderson
 
 ,
 
 70 Haw. 276
 
 , 283,
 
 768 P.2d 1293
 
 , 1299 (1989) ;
 
 Akau v. Olohana Corp.
 
 ,
 
 65 Haw. 383
 
 , 390,
 
 652 P.2d 1130
 
 , 1135 (1982).
 
 [1]
 
 The plaintiff's injury, or threat of injury, cannot be "abstract, conjectural or merely hypothetical," but concrete, such that a court may fairly trace its cause and provide the parties an adequate resolution.
 
 Life of the Land II
 
 ,
 
 63 Haw. at
 
 173 n.6,
 
 623 P.2d at
 
 446 n.6.
 

 Courtrooms are not the place "to vindicate individual value preferences,"
 
 Hawaii's Thousand Friends
 
 ,
 
 70 Haw. at 284
 
 ,
 
 768 P.2d at 1299
 
 , or to resolve "a difference of opinion between a concerned citizen and his elected representatives in government,"
 
 Bremner v. City & Cty. of Honolulu
 
 ,
 
 96 Hawai'i 134
 
 , 142,
 
 28 P.3d 350
 
 , 358 (App. 2001). A plaintiff must therefore count "himself among the injured," and "not merely air[ ] a political or intellectual grievance."
 
 Akau
 
 ,
 
 65 Haw. at 390
 
 ,
 
 652 P.2d at 1135
 
 .
 

 When we apply these principles, "[o]ur touchstone remains the needs of justice."
 
 Life of the Land II
 
 ,
 
 63 Haw. at 176
 
 ,
 
 623 P.2d at 441
 
 (citation and internal quotation marks omitted). Accordingly, "[t]his court has adopted a broad view of what constitutes a 'personal stake' in cases in which the rights of the public might otherwise be denied [a] hearing in a judicial forum."
 
 Pele Defense Fund v. Paty
 
 ,
 
 73 Haw. 578
 
 , 593,
 
 837 P.2d 1247
 
 , 1257-58 (1992) (citations omitted).
 

 Traditionally, injuries shared by the general public were not judicially cognizable, and a plaintiff asserting such an injury had standing only "if he suffered a special injury that was different in kind, and not merely in degree, from the general public."
 
 Akau
 
 ,
 
 65 Haw. at 386
 
 ,
 
 652 P.2d at 1133
 
 . Similar to other state and federal courts, however, Hawai'i courts have followed "the trend away from the special injury rule towards the view that a plaintiff, if injured, has standing."
 
 Id.
 
 at 388,
 
 652 P.2d at 1134
 
 . In adopting this position, we explained:
 

 We concur in this trend because we believe it is unjust to deny members of the public the ability to enforce the public's rights when they are injured. "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury."
 
 Marbury v. Madison
 
 ,
 
 5 U.S. 1
 
 [ (Cranch 1]37, 163,
 
 2 L.Ed. 60
 
 (1803).
 

 Id.
 

 2. Tax Foundation Has Established Standing As a Taxpayer
 

 This trend away from the "special injury rule" began in the context of taxpayer challenges
 to illegal government action regarding the management and expenditure of public funds.
 
 See, e.g.
 
 ,
 
 Mottl v. Miyahira
 
 ,
 
 95 Hawai'i 381
 
 , 390-91,
 
 23 P.3d 716
 
 , 725-26 (2001) ;
 
 Hawaii's Thousand Friends
 
 ,
 
 70 Haw. at 283
 
 ,
 
 768 P.2d at
 
 1299 ;
 
 Akau
 
 ,
 
 65 Haw. at 386-87
 
 ,
 
 652 P.2d at 1133
 
 .
 

 Hawai'i has a long history of recognizing individual taxpayers' standing to seek relief in such cases.
 
 See, e.g.
 
 ,
 
 Castle v. Atkinson
 
 ,
 
 16 Haw. 769
 
 , 774 (Haw. Terr. 1905) (recognizing "the right of resident taxpayers to ... prevent an illegal disposition of the moneys of the county, or the illegal creation of a debt which they, in common with other property holders of the county, may otherwise be compelled to pay");
 
 Wilder v. Pinkham
 
 ,
 
 23 Haw. 571
 
 , 573 (Haw. Terr. 1917) ("The theory upon which a suit by a taxpayer to restrain the illegal expenditure of public money may be maintained is that of protection to the property rights of the complainant.");
 
 Wilson v. Stainback
 
 ,
 
 39 Haw. 67
 
 , 72 (Haw. Terr. 1951) (providing that a taxpayer's "right to sue and prevent the violation of law" requires "that some interests or property of the taxpayer would be injuriously affected by illegal acts of public officials, about to be committed in expending public money or creating a public debt").
 

 The "basic theory" behind taxpayer standing is:
 

 that the illegal action is in some way injurious to municipal and public interests, and that if permitted to continue, it will in some manner result in increased burdens upon, and dangers and disadvantages to, the municipality and to the interests represented by it and so to those who are taxpayers.
 

 Munoz v. Ashford
 
 ,
 
 40 Haw. 675
 
 , 683 (Haw. Terr. 1955) (citation and quotation marks omitted).
 

 This "basic theory,"
 

 id.
 

 ,
 
 aligns with the "theory of injury presented by" Tax Foundation,
 
 Superferry I
 
 ,
 
 115 Hawai'i at 321
 
 ,
 
 167 P.3d at 314
 
 . Tax Foundation argues that "the Foundation, as a taxpayer," is "continuously injured by the State diverting money away from [HART], which causes over-collection of the amounts needed to sustain HART." Tax Foundation argues that "[t]he Foundation has paid the Surcharge and is vitally invested in its proper use considering it will be continually taxed for the same until the rail project is finished." Tax Foundation has also argued that while "[i]t and all other Honolulu taxpayers have dutifully paid the County Surcharge, ... they are not receiving the full benefit as prescribed under HRS § 248-2.6 (1993 & Supp. 2005). The fact that the State has kept over $177 million, means that the Plaintiff and others have that much more to pay." Tax Foundation alleges, "If the money diverted by the State were given to the County as required, the surcharge could end sooner."
 

 Tax Foundation's standing argument directly invokes the principles of taxpayer standing based on threatened harm to its economic interests as a taxpayer. To determine whether this alleged injury is judicially cognizable under the circumstances, it is appropriate to determine whether Tax Foundation has satisfied the elements of taxpayer standing.
 
 [2]
 

 In
 
 Hawaii's Thousand Friends
 
 , this court articulated two requirements for taxpayer standing: "(1) plaintiff must be a taxpayer who contributes to the particular fund from
 which the illegal expenditures are allegedly made; and (2) plaintiff must suffer a pecuniary loss
 
 [
 

 3
 

 ]
 
 [by the increase of the burden of taxation], which, in cases of fraud, are presumed." 70 Haw. at 282,
 
 768 P.2d at 1298
 
 . Tax Foundation satisfies both elements in this case.
 

 First, Tax Foundation has established that, through the tax it pays on its annual fundraising activities, it contributes to the particular fund from which illegal expenditures are allegedly made. In addition to paying general excise and use taxes at a 4% rate to the State, Tax Foundation pays the county surcharge at a rate of 0.5%. The State collects this surcharge, deposits it into a special fund, and, after deducting 10% of the gross proceeds, disburses the balance to the City and County of Honolulu. HRS § 248-2.6(a) (1993 & Supp. 2005). Tax Foundation alleges that "the bulk of the 10% retained by the State" exceeds the State's costs of administrating the county surcharge. Thus, according to Tax Foundation, the excess portion of the 10% is retained and diverted illegally.
 

 Second, Tax Foundation has alleged future pecuniary loss. Tax Foundation contends that, if permitted, the State's continued retention of the 10% of gross proceeds from the surcharge will result in an increased tax burden for Honolulu taxpayers, including Tax Foundation.
 

 This case is unlike
 
 Iuli v. Fasi
 
 ,
 
 62 Haw. 180
 
 , 185,
 
 613 P.2d 653
 
 , 657 (1980), in which we declined to recognize taxpayer standing because the plaintiffs failed to allege future pecuniary loss. While the plaintiffs in
 
 Iuli
 
 challenged a government contract as illegal and stated that their taxes had increased, they nonetheless admitted that they were unsure whether the challenged contract caused the increase in taxes, and that they suffered no cognizable loss.
 
 See
 

 id.
 

 Here, in contrast, a direct link may be drawn between the rail surcharge and an impact on Honolulu taxpayers. Tax Foundation argues that "the State has created a vicious cycle: the more it diverts, the less the City receives, the longer the GET surcharge is needed; the more the taxpayers must pay." In other words, a portion of the surcharge is withheld by the State. If not withheld, these funds would be returned to the City and used to fund the rail project. It is thus reasonably likely that withholding this portion of the surcharge would cause a reduction in the proceeds available to the City and County of Honolulu, which would accordingly increase the overall tax burden for Honolulu taxpayers, including Tax Foundation.
 

 Given this set of facts, Tax Foundation has sufficiently alleged an injury to its interests as a taxpayer and satisfied the elements of taxpayer standing. Tax Foundation established a "personal stake" in the controversy based on its interest as a taxpayer that pays the county surcharge and contributes to the general fund, and whose pecuniary interests are threatened by the State's continued retention of a portion of the surcharge.
 

 Such injury may be fairly traced to the State's actions in withholding a 10% portion of the rail surcharge from the City and County of Honolulu, and may be redressed by a favorable decision declaring the State's actions to be illegal, and ordering the State to return unlawfully withheld portions of the surcharge to the Honolulu government. Tax Foundation correctly observes that such a decision "would provide more support to HART for the benefit of the City - to the relief of the affected taxpayers."
 

 Tax Foundation has thus alleged a threatened injury to its judicially cognizable interest in its capacity as a taxpayer, which is traceable to the State's actions, and likely to be redressed by declaratory and injunctive relief in its favor. Thus, Tax Foundation has standing.
 
 See
 

 Akau
 
 ,
 
 65 Haw. at 388, 390
 
 ,
 
 652 P.2d at 1134, 1135
 
 (holding "that a member of the public has standing to sue to enforce the rights of the public ... if he can show that he has suffered an injury in fact" by "demonstrat[ing] some injury to a recognized interest such as economic or aesthetic, and is
 himself among the injured and not merely airing a political or intellectual grievance").
 

 3. HRS § 632-1 Does Not Establish a Statutory Test for Standing or Preclude Application of the "Injury in Fact" Test
 

 I respectfully disagree with the conclusion reached by the Majority in Part Two that HRS § 632-1 sets forth a test for standing, or precludes application of this court's general standing principles. Under HRS Chapter 632, plaintiffs seeking declaratory relief must establish a "personal stake in the outcome of the controversy" by demonstrating an actual or threatened injury to a concrete, judicially cognizable interest, that is fairly traceable to the defendant and redressible by a court ruling.
 
 See
 

 Life of the Land II
 
 ,
 
 63 Haw. at 172
 
 ,
 
 623 P.2d at 438
 
 .
 

 This "three-part standing test," or "traditional injury in fact" analysis, is employed "to determine whether a plaintiff has the requisite stake" in a controversy.
 
 Superferry I
 
 ,
 
 115 Hawai'i at 318-19
 
 ,
 
 167 P.3d at 311-12
 
 . As a standard "based on this court's prudential rules of judicial
 
 self
 
 -governance,"
 

 id.
 

 at 319
 
 ,
 
 167 P.3d at 312
 
 (emphasis added), this rule is not statutory in origin.
 

 However, "in addition to this court's judicially-developed standing rules, this court must take guidance from applicable statutes or constitutional provisions regarding the right to bring suit."
 

 Id.
 

 General standing requirements may "be tempered, or even prescribed, by legislative and constitutional declarations of policy."
 
 Life of the Land II
 
 ,
 
 63 Haw. at
 
 172 & n.5,
 
 623 P.2d at
 
 438 & n.5.
 

 In
 
 Life of the Land II
 
 , this court identified "HRS Chapter 632, Declaratory Judgments" as an example of such an instance. Thus, we should be mindful of the purpose of Chapter 632:
 

 This chapter is declared to be remedial. Its purpose is to afford relief from the uncertainty and insecurity attendant upon controversies over legal rights, without requiring one of the parties interested so to invade the rights asserted by the other as to entitle the party to maintain an ordinary action therefor. It is to be liberally interpreted and administered, with a view to making the courts more serviceable to the people.
 

 HRS § 632-6.
 

 With the "view to making the courts more serviceable to the people,"
 

 id.
 

 ,
 
 this court has not limited itself to considering "controversies over legal rights,"
 

 id.
 

 ,
 
 but rather has expanded standing to encompass controversies over judicially cognizable interests,
 
 see
 

 Superferry I
 
 ,
 
 115 Hawai'i at 321
 
 ,
 
 167 P.3d at 314
 
 . This court has also lowered standing barriers in cases implicating environmental concerns and native Hawaiian rights.
 
 See, e.g.
 
 ,
 
 Akau
 
 ,
 
 65 Haw. at 390
 
 ,
 
 652 P.2d at
 
 1135 ;
 
 Citizens for Prot. of N. Kohala Coastline v. Cty. of Hawai'i
 
 ,
 
 91 Hawai'i 94
 
 , 101,
 
 979 P.2d 1120
 
 , 1127 (1999) ;
 
 Pele Defense Fund
 
 ,
 
 73 Haw. at 589-90
 
 ,
 
 837 P.2d at 1256
 
 .
 

 While we have "tempered" standing requirements in accord with HRS § 632-6 's policy declaration, this court has never held that this policy obviates the need to establish a "personal stake" in the controversy, or an "injury in fact."
 
 See, e.g.
 
 ,
 
 Mottl
 
 ,
 
 95 Hawai'i at 393
 
 ,
 
 23 P.3d at
 
 728 ;
 
 see also
 

 Bremner
 
 ,
 
 96 Hawai'i at 142
 
 ,
 
 28 P.3d at 358
 
 . Nor has this court ever held that Chapter 632 "prescribe[s]" rules for standing.
 
 Life of the Land II
 
 ,
 
 63 Haw. at
 
 172 & n.5,
 
 623 P.2d at
 
 438 & n.5 ("While standing requisites ordinarily comprise one of the 'prudential rules' discussed earlier, they may also be tempered, or even prescribed, by legislative and constitutional declarations of policy.").
 

 To understand why, it is important in the first instance to address the plain language of HRS § 632-1. This statute provides:
 

 (a)
 
 In cases of actual controversy
 
 , courts of record, within the scope of their respective jurisdictions, shall have power to make binding adjudications of right, whether or not consequential relief is, or at the time could be, claimed, and no action or proceeding shall be open to objection on the ground that a judgment or order merely declaratory of right is prayed for; provided that declaratory relief may not be obtained in any district court, or in any controversy with respect to taxes, or in any case where a divorce or annulment of marriage is sought. Controversies involving the interpretation
 of deeds, wills, other instruments of writing, statutes, municipal ordinances, and other governmental regulations may be so determined, and this enumeration does not exclude other instances
 
 of actual antagonistic assertion and denial of right
 
 .
 

 (b) Relief by declaratory judgment may be granted in civil cases where an actual controversy exists between contending parties, or where the court is satisfied that antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation, or where in any such case the court is satisfied that a party asserts a legal relation, status, right, or privilege in which the party has a concrete interest and that there is a challenge or denial of the asserted relation, status, right, or privilege by an adversary party who also has or asserts a concrete interest therein, and the court is satisfied also that a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding. Where, however, a statute provides a special form of remedy for a specific type of case, that statutory remedy shall be followed; but the mere fact that an actual or threatened controversy is susceptible of relief through a general common law remedy, a remedy equitable in nature, or an extraordinary legal remedy, whether such remedy is recognized or regulated by statute or not, shall not debar a party from the privilege of obtaining a declaratory judgment in any case where the other essentials to such relief are present.
 

 HRS § 632-1 (emphasis added).
 

 Titled "Jurisdiction; controversies subject to," HRS § 632-1 is a jurisdictional statute that provides civil courts the authority to issue "binding adjudications of [the] right[s]" of parties in "cases of actual controversy," or "instances of actual antagonistic assertion and denial of right."
 

 Id.
 

 In subsection (b), the statute sets forth the "essentials to [declaratory] relief [that must be] present" for courts to exercise jurisdiction over a controversy in which declaratory relief is sought.
 

 Id.
 

 It provides:
 

 Relief by declaratory judgment may be granted in civil cases[:]
 

 [ (1) ] where an actual controversy exists between contending parties,
 

 or
 

 [ (2) ] where the court is satisfied that
 

 [ (a) ] antagonistic claims are present between the parties involved[,]
 

 [ (i) ] which indicate imminent and inevitable litigation,
 

 or
 

 [ (ii) ] where in any such case the court is satisfied that a party asserts a legal relation, status, right, or privilege in which the party has a concrete interest and that there is a challenge or denial of the asserted relation, status, right, or privilege by an adversary party who also has or asserts a concrete interest therein,
 

 and
 

 [ (b) ] the court is satisfied also that a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding.
 

 Id.
 

 Pursuant to this subsection, a "declaratory judgment may be granted" where: 1) "an actual controversy exists between contending parties," or 2) a "threatened controversy" of a sufficiently imminent, inevitable, or concrete nature merits judicial resolution.
 
 [4]
 

 Id.
 

 An "actual controversy" can take the form of any justiciable civil case. The justiciability standards for determining whether an "actual controversy" exists arise from prudential concerns of judicial self-governance.
 
 See
 

 Life of the Land II
 
 ,
 
 63 Haw. at 178
 
 ,
 
 623 P.2d 431
 
 (noting that determination of whether an "actual controversy" exists is governed by "prudential rules"). These prudential rules, as recognized by the Majority, have been discussed as follows:
 

 Our guideposts for the application of the rules of judicial self-governance founded in
 concern about the proper - and properly limited - role of courts in a democratic society reflect the precepts enunciated by the Supreme Court. When confronted with an abstract or hypothetical question, we have addressed the problem in terms of a prohibition against rendering advisory opinions; when asked to decide whether a litigant is asserting legally recognized interests, personal and peculiar to him, we have spoken of standing; when a later decision appeared more appropriate, we have resolved the justiciability question in terms of ripeness; and when the continued vitality of the suit was questionable, we have invoked the mootness bar.
 

 Trustees of Office of Hawaiian Affairs v. Yamasaki
 
 ,
 
 69 Haw. 154
 
 , 171-72,
 
 737 P.2d 446
 
 , 456 (1987) (internal citations, quotation marks, punctuation, and footnotes omitted).
 

 Because an "actual controversy" must be justiciable, each of these prudential rules, including standing, apply. As the Majority acknowledges, this provision "does not set out any actual standing requirements." Opinion by McKenna, J., at 144 Hawai'i at 201, 439 P.3d at 153. Thus, it is up to courts to determine whether prudential requisites, including standing, have been met, such that the matter constitutes an "actual controversy" in which declaratory relief, among other forms of relief, may be awarded. Determining whether a plaintiff has "a personal stake in the outcome of the controversy" is therefore part of the inquiry as to whether a case is an "actual controversy."
 
 See
 

 Reliable Collection Agency, Ltd. v. Cole
 
 ,
 
 59 Haw. 503
 
 , 510-11,
 
 584 P.2d 107
 
 , 111 (1978) ("While we are not subject to the 'case or controversy' requirement of Article III of the United States Constitution, the prudential considerations which have been suggested in the federal cases on standing persuade us that a party should not be permitted ... to enforce public law without a personal interest which will be measurably affected by the outcome of the case.").
 

 In addition to actual controversies, in which all prudential requisites have been met, courts are empowered to hear and resolve "threatened controvers[ies]" in appropriate circumstances.
 
 See
 
 HRS § 632-1(b).
 

 Traditionally, if a case had not fully ripened
 
 [5]
 
 into an actual controversy, it was not fit for judicial resolution.
 
 See
 

 Kaleikau v. Hall
 
 ,
 
 27 Haw. 420
 
 , 425 (Haw. Terr. 1923) ("Under the rules of the common law, except in a few instances, the courts have uniformly refused to entertain jurisdiction in cases unless a cause of action actually existed at the time suit was brought.") This had harsh consequences, as it meant that courts "would only award compensation for damages sustained" after a breach or injury had occurred.
 

 Id.
 

 at 426
 
 . Courts "would not ordinarily prevent anticipated damage."
 

 Id.
 

 When the bill that enacted HRS §§ 632-1 and 632-6 was first introduced in 1921, the Senate Committee on the Judiciary explained that its purpose was to provide "parties in dispute" a judicial determination of rights "before a cause of action accrues by breach of such rights by either party." S. Stand. Comm. Rep. No. 263, in 1921 Senate Journal, at 616. The committee noted the frequent occurrence of disputes over property rights, and that breaches would be avoided if the parties "could have had a prior adjudication of their rights, instead of being forced to see their remedy after the damage."
 
 Id.
 
 at 616-17.
 

 The legislature thus sought to expand when in time a controversy may be heard; it did not seek to eliminate the need for plaintiffs to have "a personal stake" in its outcome.
 
 Life of the Land II
 
 ,
 
 63 Haw. at 172
 
 ,
 
 623 P.2d at
 
 438 ;
 
 see
 
 H. Stand. Comm. Rep. No. 594, in 1921 House Journal, at 1296 (stating that the bill was not meant to empower courts "to answer merely hypothetical questions").
 

 This purpose is reflected in the language of the current form of the statute. To exercise jurisdiction over a threatened controversy, a court must be satisfied that the matter involves "antagonistic claims between the parties" of a sufficiently imminent, inevitable, or concrete nature, and that "a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding." HRS § 632-1(b).
 

 The Majority derives its " HRS § 632-1 standing" test from these "essentials to [declaratory] relief" for a threatened controversy.
 

 Id.
 

 The Majority contends:
 

 In the second prong of HRS § 632-1(b), ... the legislature has expressed its policy and has expressed its view regarding the "proper - yet properly limited - role of [our] courts" -
 
 by providing that a party has standing to bring an action for declaratory relief
 
 in a civil case (1) where antagonistic claims exist between the parties (i) that indicate imminent and inevitable litigation, or (ii)
 
 where the party seeking declaratory relief has
 
 a concrete interest in a legal relation, status, right, or privilege that is challenged or denied by the other party, who has or asserts a concrete interest in the same legal relation, status, right, or privilege; and (2) a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding.
 

 Opinion by McKenna, J., at 144 Hawai'i at 213, 439 P.3d at 153 (emphasis added).
 

 To be clear, the statute does not "provid[e] that a party has standing to bring an action for declaratory relief," or refer to "the party seeking declaratory relief" in such specific terms.
 
 Compare
 

 id.
 

 with
 
 HRS § 632-1(b) ("where in any such case the court is satisfied that a party ...").
 
 [6]
 
 Rather, the plain terms of HRS § 632-1 do not prescribe a test for standing.
 

 Statutes that prescribe a test for standing, and thus supplant our judicially-developed standing rules, include provisions that concern "
 
 who
 
 may bring suit" in a certain case,
 
 Superferry I
 
 ,
 
 115 Hawai'i at
 
 325 n.35,
 
 167 P.3d at
 
 318 n.35 (emphasis added), whether, for example, it is "an aggrieved party," HRS § 343-7(a) (2010), "[a]ny interested person,"
 

 id.
 

 § 91-7 (2012), or "[a]ny person,"
 

 id.
 

 § 92-12 (2012). These provisions grant such persons the right to "bring suit" or seek judicial review under specific circumstances.
 
 Superferry I
 
 ,
 
 115 Hawai'i at
 
 325 n.35,
 
 167 P.3d at
 
 318 n.35 ;
 
 see, e.g.
 
 , HRS § 92-12 ("Any person may commence a suit ... for the purpose of requiring compliance with or preventing violations" of the Sunshine Law);
 

 id.
 

 § 91-7 ("Any interested person may obtain a judicial declaration as to the validity of an agency rule.");
 

 id.
 

 § 91-14(a) (2012) ("Any person aggrieved by a final decision and order in a contested case ... is entitled to judicial review thereof under this chapter[.]");
 

 id.
 

 § 343-7(a) (referring to "an aggrieved party for purposes of bringing a judicial action" pursuant to the Hawai'i Environmental Policy Act (HEPA)).
 

 In contrast, HRS § 632-1 does not concern
 
 who
 
 may bring an action for declaratory relief. Rather, its provisions address what "controversies [may be] subject to" a declaratory order. HRS § 632-1. Respectfully, the Majority's test for " HRS § 632-1 standing" conflates these two concepts, and thus is contrary to our case law that recognizes that standing "focus[es] on the party seeking [declaratory relief,] rather than on the issues he
 [or she] wants adjudicated."
 
 Life of the Land II
 
 ,
 
 63 Haw. at 172
 
 ,
 
 623 P.2d at 438
 
 .
 

 In this regard, the Majority's analysis sharply contrasts with other cases, including
 
 Superferry I
 
 and
 
 Asato v. Procurement Policy Board
 
 ,
 
 132 Hawai'i 333
 
 ,
 
 322 P.3d 228
 
 (2014), in which we have identified standing rules within specific statutes. In
 
 Superferry I
 
 , for example, this court held that HRS § 343-7, regarding proceedings to enforce violations of HEPA, "concern[ed] 'standing requisites.' " 115 Hawai'i at 325 n.35,
 
 167 P.3d at
 
 318 n.35. In particular, we addressed how the terms in section 343-7(a) referring to "an aggrieved party for purposes of bringing [a] judicial action" or "[o]thers ... [who] may be adjudged aggrieved" related to standing.
 

 Id.
 

 at 325
 
 ,
 
 167 P.3d at 318
 
 .
 

 We explained:
 

 Both the text and the legislative history of HRS § 343-7 indicate that it concerns "standing requisites." In its original version, as passed by the legislature in 1974,
 
 the reference to standing was explicit
 
 . The original "Limitation on Actions" section, which corresponds to HRS § 343-7 today, did not include any statements that could be construed to relate to standing for subsections (a) and (b), that is, judicial proceedings to challenge the lack of an EA or determinations regarding whether or not an EIS will be required. However, in the third subsection, concerning review of the "acceptability" of an EIS, the original law included the proviso that "only
 
 affected agencies
 
 , or
 
 persons who will be aggrieved
 
 by a proposed action and who provided written comments to such a statement during the designated review period shall have
 
 standing
 
 to file suit." HRS § 343-6(c) (1976) (emphasis added) (current version at HRS § 343-7(c) (1993)). The report of the Senate Committee on Ecology, Environment and Recreation that considered the bill also demonstrates that the committee clearly viewed the "Judicial Review" section as dealing with standing concerns. Thus, the committee report described the effect of the amendment as "provid[ing] a citizen
 
 standing to sue
 
 only when he has previously been involved in the public review process of the environmental impact statement and when his comments at that time dealt with the issues described in the suit," and also stated that "[h]owever, his
 
 standing
 
 would be recognized after exhausting the existing remedies open to him as specified in Chapter 91." Sen. Comm. Rep. 956-74, in 1974 Senate Journal, at 1126-27.
 

 Analogous sections regarding who may bring suit were added to subsections (a) and (b) in 1979, which allow pre-EIS challenges. Incidentally, at this time the legislature also eliminated the term "standing to sue" from Section 343-7(c), instead referring to those who "shall be adjudged aggrieved parties
 
 for the purpose of bringing judicial action under this subsection
 
 ." 1979 Haw. Sess. L. Act 197, § 8, at 412-13 (emphasis added). However, there is no relevant legislative history on these changes, as major changes of the 1979 law focused on other areas-the remainder being characterized by the Senate Committee Report as "primarily housekeeping changes." Sen. Comm. Rep. 628, in 1979 Senate Journal, at 1264.
 

 Therefore, although the legislative history of HRS § 343-7 is not particularly enlightening with respect to
 
 what
 
 standing requirements must be fulfilled in order for a party to bring judicial action under HEPA, the legislative history does clearly indicate that the subsection is directed at the question of standing to sue.
 

 Id.
 

 at 325 n.35,
 
 167 P.3d at
 
 318 n.35 (first emphasis added).
 

 Unlike the court in
 
 Superferry I
 
 , the Majority points to no actual language or legislative history of HRS § 632-1 indicating that it "is directed at the question of standing to sue."
 

 Id.
 

 This case also differs from
 
 Asato
 
 , which considered standing requirements in actions for declaratory relief pursuant to HRS § 91-7.
 
 See
 

 132 Hawai'i at 341-45
 
 ,
 
 322 P.3d at 236-40
 
 . HRS § 91-7"allows '[a]ny interested person' to obtain 'a judicial declaration as to the validity of an agency rule.' "
 

 Id.
 

 at 341
 
 ,
 
 322 P.3d at 236
 
 . With regard to the issue of standing,
 
 Asato
 
 "considered what is required to become '[a]ny interested person' under HRS § 91-7."
 

 Id.
 

 at 341
 
 ,
 
 322 P.3d at 236
 
 . The
 majority in
 
 Asato
 
 held that a plaintiff has standing as "any interested person" if they "may be affected" by a regulation, and they need not demonstrate an "injury in fact" to have standing.
 

 Id.
 

 at 341, 345
 
 ,
 
 322 P.3d at 236, 238
 
 . In considering who may constitute "any interested person" within the meaning of HRS § 91-7, the majority analyzed statutory plain language and legislative history, and compared the terms "any interested person" with "aggrieved person" in HRS Chapter 91.
 
 [7]
 

 ibr.US_Case_Law.Schema.Case_Body:v1">See
 

 id.
 

 at 341-45
 
 ,
 
 322 P.3d at 236-40
 
 .
 

 As part of its analysis, the
 
 Asato
 
 majority examined why the legislature included the terms "any interested person" when adopting HRS § 91-7, as it "deviated from the [Model State Administrative Procedure Act (MSAPA) ]."
 

 Id.
 

 at 343
 
 ,
 
 322 P.3d at 238
 
 . The court noted:
 

 The MSAPA section setting out a procedure for declaratory judgments as to the validity or applicability of rules provides, as its first sentence, that: "The validity or applicability of a rule may be determined in an action for declaratory judgment in the [court],
 
 if it is alleged that the rule, or its threatened application, interferes with or impairs, or threatens to interfere with or impair, the legal rights or privileges of the plaintiff
 
 ."
 

 Id.
 

 (emphasis added). In contrast, the first sentence of HRS § 91-7(a) provides, to reiterate, that "
 
 [a]ny interested person
 
 may obtain a judicial declaration as to the validity of an agency rule...."
 

 In explaining this departure from the MSAPA, the House Judiciary Committee stated that "[y]our Committee is of the opinion that this section will allow an interested person to seek judicial review on the validity of a rule for the reasons enumerated therein
 
 regardless of whether there is an actual case or controversy
 
 ." H. Stand. Comm. Rep. No. 8, in 1961 House Journal, at 658 (emphasis added). The three-part injury test serves as Hawai'i's counterpart to the Article III "cases and controversies" requirement.
 
 See
 

 Bush [v. Watson
 
 ], 81 Hawai'i [474,] 479, 918 P.2d [1130,] 1135 [ (1996) ];
 
 Life of the Land [II]
 
 ,
 
 63 Haw. at 172
 
 ,
 
 623 P.2d at 438
 
 .
 
 See
 

 also
 

 Mottl
 
 ,
 
 95 Hawai'i at 396
 
 ,
 
 23 P.3d at 731
 
 (Acoba, J., concurring, joined by Ramil, J.) ("Our analogue of 'article III' jurisdictional requirements is the three-part injury test.").
 

 Id.
 
 at 343-44,
 
 322 P.3d at 238-39
 
 (emphasis in original).
 

 The
 
 Asato
 
 majority's review of HRS § 91-7 has particular relevance to HRS § 632-1, as these statutes are in
 
 pari
 

 materia
 
 .
 
 See
 

 Life of the Land v. Land Use Comm'n
 
 (
 
 Life of the Land I
 
 ),
 
 58 Haw. 292
 
 ,
 
 568 P.2d 1189
 
 (1977) ;
 
 see also
 

 Costa v. Sunn
 
 ,
 
 5 Haw. App. 419
 
 , 424,
 
 697 P.2d 43
 
 , 47 (1985) (considering
 
 Life of the Land I
 
 "to be authority to hold that HRS §§ 91-7 and 632-1 are in
 
 pari
 

 materia
 
 , and § 91-7 serves the same purpose regarding the validity of agency regulations as does § 632-1 regarding other disputed matters between parties").
 

 Unlike HRS § 91-7, HRS § 632-1 requires there to be an actual controversy, as its statutory language plainly reflects.
 
 See
 
 HRS § 632-1(a) (providing that relief by declaratory judgment may be obtained "[i]n cases of
 
 actual controversy
 
 " (emphasis added));
 
 Credit Assocs. of Maui, Ltd. v. Leong
 
 ,
 
 56 Haw. 104
 
 , 105,
 
 529 P.2d 198
 
 , 200 (1974) (recognizing that HRS § 632-1 requires "a concrete interest in an actual controversy" or a "justiciable controversy");
 
 [8]
 

 see also
 

 Costa
 
 ,
 
 5 Haw. App. at 425
 
 ,
 
 697 P.2d at 48
 
 (" [HRS] § 91-7 merely removes the usual impediment to declaratory actions that there be an 'actual controversy.' ")
 

 Critically, unlike HRS § 91-7, HRS § 632-1 does not allow "any interested person" to obtain a judicial declaration on a matter of concern. Rather, HRS § 632-1 lacks the kind of provision addressing who may file suit that is present in HRS § 91-7, as well as sections 91-14 and 92-12, among others.
 

 In the absence of statutory language that actually concerns standing, "the standard rules governing standing to sue apply" to plaintiffs in HRS § 632-1 actions.
 
 Kaapu v. Aloha Tower Dev. Corp.
 
 ,
 
 74 Haw. 365
 
 , 390-91,
 
 846 P.2d 882
 
 , 893 (1993) (applying "the standard rules governing standing to sue," including the "injury in fact" test, in the absence of statutory language establishing the right to sue as a private attorney general). These rules require plaintiffs to demonstrate "a personal stake in the outcome of the controversy," which may be shown through satisfaction of the "injury in fact" test.
 
 See
 

 id.
 
 at 390-91,
 
 846 P.2d at 893
 
 .
 

 The "injury in fact" standard does not conflict with either the language or purpose of HRS § 632-1. While the legislature directs that Chapter 632 "is to be liberally interpreted and administered," HRS § 632-6, this direction does not reflect legislative intent to prescribe a test for standing, or to preclude courts from ensuring that in "instances of actual antagonistic assertion and denial of right,"
 

 id.
 

 § 632-1(a), the parties in the "controvers[y] over legal rights,"
 

 id.
 

 § 632-6, are those with a "personal stake in the outcome,"
 
 Life of the Land II
 
 ,
 
 63 Haw. at 172
 
 ,
 
 623 P.2d at 438
 
 .
 

 This court's judicially-developed standing test also does not place an additional burden on plaintiffs seeking declaratory relief. For example, a plaintiff alleging a "challenge or denial" of their "concrete interest" in "a legal relation, status, right, or privilege," HRS § 632-1(b), will satisfy the injury prong of the "injury in fact" test. A plaintiff asserting that this "challenge or denial ... [was] by an adversary party" to the proceedings,
 

 id.
 

 ,
 
 will satisfy the causation prong of the test. A plaintiff establishing that "a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding,"
 

 id.
 

 ,
 
 will satisfy the redressibility prong.
 

 Thus, I see no need to stray from this court's precedent applying the "injury in fact" test to HRS § 632-1 actions. "Complexities about standing are barriers to justice; in removing the barriers the emphasis should be on the needs of justice."
 
 Life of the Land II
 
 ,
 
 63 Haw. at
 
 174 n.8,
 
 623 P.2d 431
 
 , 439 n.8 (quoting
 
 E. Diamond Head Ass'n v. Zoning Bd. of Appeals
 
 ,
 
 52 Haw. 518
 
 ,
 
 479 P.2d 796
 
 (1971) ). The concept of " HRS § 632-1 standing" injects unnecessary complexity into a simple doctrine and a straightforward line of case law.
 

 4. Hawai'i Case Law Requires an Injury in Fact in HRS § 632-1 Actions
 

 Because HRS §§ 632-1 and 632-6 do not establish a test for standing, Hawai'i courts have consistently applied this general standing test in HRS § 632-1 actions.
 

 In analyzing those cases, the Majority employs a flawed analogy to
 
 Asato
 
 , which "considered what is required to become '[a]ny interested person' under HRS § 91-7."
 
 132 Hawai'i at 341
 
 ,
 
 322 P.3d at 236
 
 . Only two cases before
 
 Asato
 
 had addressed the same issue:
 
 Life of the Land II
 
 ,
 
 63 Haw. at 175
 
 ,
 
 623 P.2d at 440
 
 , and
 
 Richard v. Metcalf
 
 ,
 
 82 Hawai'i 249
 
 ,
 
 921 P.2d 169
 
 (1996).
 
 See
 

 id.
 

 The court in
 
 Asato
 
 noted that the standard applied in
 
 Richard
 
 , a more recent case, was stricter than that in
 
 Life of the Land II
 
 .
 
 See
 

 id.
 

 at 342
 
 ,
 
 322 P.3d at 237
 
 . The court thus examined each case to determine why the standard had changed, and it analyzed the plain language and legislative history of HRS § 91-7 to determine whether such changes were appropriate.
 
 See
 

 id.
 

 The court concluded that
 
 Richard
 
 lacked "supportive reasoning" for applying the "injury in fact" test to determine whether a plaintiff was an "interested person" under HRS § 91-7.
 

 Id.
 

 at 343
 
 ,
 
 322 P.3d at 238
 
 . It held that "the plain language of HRS § 91-7 and the legislative history of that statute require[d]" a looser standard than the "injury in fact" test.
 
 See
 

 id.
 

 Accordingly, the court overruled this "ancillary holding of
 
 Richard
 
 " and re-adopted the broader standing test from
 
 Life of the Land II
 
 .
 
 See
 

 id.
 

 As discussed above, this court's analysis of HRS § 91-7 in
 
 Asato
 
 is inapplicable to the instant case, as HRS § 632-1 lacks the terms "any interested person," or any other terms that actually refer to who has a right to bring suit. Moreover, unlike the circumstances in
 
 Asato
 
 , the judicially-developed "injury in fact" standard has been consistently applied in actions for declaratory relief under HRS § 632-1.
 
 See, e.g.
 
 ,
 
 McDermott v. Ige
 
 ,
 
 135 Hawai'i 275
 
 , 278, 283-84,
 
 349 P.3d 382
 
 , 385, 390-91 (2015) ;
 
 Cty. of Hawai'i v. Ala Loop Homeowners
 
 ,
 
 123 Hawai'i 391
 
 , 433-34,
 
 235 P.3d 1103
 
 , 1145-46 (2010) ;
 
 Superferry I
 
 ,
 
 115 Hawai'i at 328
 
 ,
 
 167 P.3d at
 
 321 ;
 
 Cty. of Kaua'i ex rel. Nakazawa v. Baptiste
 
 ,
 
 115 Hawai'i 15
 
 , 28,
 
 165 P.3d 916
 
 , 929 (2007) ;
 
 Kaho'ohanohano v. State
 
 ,
 
 114 Hawai'i 302
 
 ,
 
 162 P.3d 696
 
 (2007) ;
 
 Mottl
 
 ,
 
 95 Hawai'i at 389
 
 ,
 
 23 P.3d at 724
 
 .
 

 While this court has broadened what constitutes a "personal stake" in cases concerning environmental and native Hawaiian rights, this court's standing doctrine has maintained that an "injury in fact" is a foundational requirement in each of these cases.
 
 See
 

 Superferry I
 
 ,
 
 115 Hawai'i at 320
 
 ,
 
 167 P.3d at 313
 
 ("[E]nvironmental plaintiffs must meet the three-part standing test, ... although there will be no requirement that their asserted injury be particular to the plaintiffs, and the court will recognize harms to plaintiffs['] environmental interests as injuries that may provide the basis for standing.");
 
 Sierra Club v. Hawai'i Tourism Auth. ex rel. Bd. of Dirs.
 
 ,
 
 100 Hawai'i 242
 
 , 251,
 
 59 P.3d 877
 
 , 886 (2002) (plurality opinion) (noting that "while the basis for standing has expanded in cases implicating environmental concerns and native Hawaiian rights, plaintiffs must still satisfy the injury-in-fact test.");
 
 see
 

 also
 

 Citizens
 
 ,
 
 91 Hawai'i at 101
 
 ,
 
 979 P.2d at 1127
 
 (plaintiffs' alleged injury to recreational use of shoreline was sufficient injury in fact to confer standing in declaratory judgment action challenging proposed shoreline development);
 
 [9]
 

 Pele Defense Fund
 
 ,
 
 73 Haw. at 589-90
 
 ,
 
 837 P.2d at 1256
 
 (injury to native Hawaiian organization's "customarily and traditionally exercised subsistence, cultural and religious practices" sufficient to grant standing to challenge exchange of publicly ceded lands).
 

 The Majority nevertheless contends that our cases requiring plaintiffs to satisfy the "injury in fact" test for declaratory judgment actions under HRS § 632-1 have been confusing and not well-settled. However, since
 
 Dalton v. City & County of Honolulu
 
 ,
 
 51 Haw. 400
 
 ,
 
 462 P.2d 199
 
 (1969), this court has consistently required plaintiffs seeking declaratory relief to demonstrate a concrete stake in the outcome of the controversy by establishing an injury, or threatened injury, to their judicially cognizable interests.
 

 In
 
 Dalton
 
 , the plaintiffs brought suit under HRS § 632-1, seeking to invalidate ordinances that rezoned land from residential and agricultural use to medium density apartment use.
 
 51 Haw. at 400-01
 
 ,
 
 462 P.2d at 201
 
 . This court determined that residing "in very close proximity" to a proposed high-rise
 apartment was sufficient to confer standing to seek declaratory relief regarding the validity of the ordinances.
 
 Id.
 
 at 403,
 
 462 P.2d at
 
 202 (citing
 
 Lynch v. Borough of Hillsdale
 
 ,
 
 136 N.J.L. 129
 
 ,
 
 54 A.2d 723
 
 (N.J. 1947) ).
 

 It is notable that
 
 Dalton
 
 relied on
 
 Lynch
 
 in concluding that the plaintiffs had standing to pursue relief. In
 
 Lynch
 
 , a zoning case, the Supreme Court of New Jersey considered the validity of an ordinance and a related contract between a municipal governing body and a landowner regarding the use of private property located in a residential zone.
 
 54 A.2d at 724-76
 
 . The ordinance and contract purported to allow the landowner to change the use of his property from chicken farming to the manufacture of candy for the five-year balance of the landowner's term of an existing non-conforming use permit.
 
 54 A.2d at 724-76
 
 . After discussing the merits of the challenge at length, the court briefly addressed standing, as follows:
 

 [T]here is no substance to the contention that prosecutors have not shown the
 
 special injury or damage requisite
 
 for an attack upon the ordinance and contract by certiorari. Three of the prosecutors are the owners of lands adjoining the premises in question, and the fourth is the owner of lands in the immediate vicinity; and thus they have the
 
 special interest essential to a review of the action
 
 by certiorari.
 

 Id.
 
 at 134,
 
 54 A.2d at 726
 
 (emphasis added) (citation omitted).
 

 Like in
 
 Lynch
 
 , the court in
 
 Dalton
 
 noted that the plaintiffs' proximity to a proposed use conferred a special interest in the dispute.
 
 See
 

 Dalton
 
 ,
 
 51 Haw. at 403
 
 ,
 
 462 P.2d at 202
 
 ("[T]wo of the plaintiffs apparently live across the street from said property upon which defendants plan to build high rise apartment buildings[.]" (internal quotation marks omitted)). While
 
 Dalton
 
 did not use the term "injury," or "injury in fact," the court observed that the ordinance, and the defendants' resulting development, threatened to injure the plaintiffs' concrete interests by "
 
 restricting
 
 their scenic view,
 
 limiting
 
 the sense of space[,] and
 
 increasing
 
 the density of the population."
 

 Id.
 

 (emphasis added).
 

 This court's subsequent discussions of
 
 Dalton
 
 support this interpretation. In
 
 Waianae Model Neighborhood Area Ass'n v. City & County of Honolulu
 
 ,
 
 55 Haw. 40
 
 , 44,
 
 514 P.2d 861
 
 , 864 (1973), we stated that the "[p]laintiff has standing in this case in its own right under
 
 Dalton
 
 " to bring a declaratory judgment action challenging the validity of a building permit. We concluded that the pleadings "contain[ed] a sufficient showing of individualized harm to plaintiff and its members" to confer standing, which was distinguishable from
 
 Sierra Club v. Morton
 
 ,
 
 405 U.S. 727
 
 ,
 
 92 S.Ct. 1361
 
 ,
 
 31 L.Ed.2d 636
 
 (1972), in which the plaintiff "sought 'to do no more than vindicate [its] own value preferences through the judicial process.' "
 
 Waianae Model Neighborhood Area Ass'n
 
 ,
 
 55 Haw. at 44
 
 ,
 
 514 P.2d at 864
 
 (quoting
 
 Sierra Club
 
 ,
 
 405 U.S. at 740
 
 ,
 
 92 S.Ct. 1361
 
 ). Accordingly, we interpreted "standing ... under
 
 Dalton
 
 " to require a "sufficient showing of individualized harm," or an injury in fact.
 

 Id.
 

 This court also discussed
 
 Dalton
 
 in
 
 Life of the Land II
 
 ,
 
 63 Haw. at 174
 
 ,
 
 623 P.2d at 439
 
 . We noted that our opinions had moved "from 'legal right' to 'injury in fact' as the ... standard ... for judging whether a plaintiff's stake in a dispute is sufficient to invoke judicial intervention."
 

 Id.
 

 As an example of this court's application of the "injury in fact" standard in cases involving environmental concerns, we discussed
 
 Dalton
 
 as illustrative.
 
 See
 

 id.
 
 at 174,
 
 623 P.2d at 439-40
 
 .
 

 Furthermore, while the Majority suggests that "no prudential reasons have ever been set forth in support" of applying the "injury in fact" test to determine standing in HRS § 632-1 actions, Opinion by McKenna, J., at 144 Hawai'i at 195, 439 P.3d at 147 (emphasis omitted), the rationale underlying this requirement was comprehensively and persuasively addressed by the ICA in
 
 Bremner v. City & County of Honolulu
 
 ,
 
 96 Hawai'i 134
 
 ,
 
 28 P.3d 350
 
 (App. 2001).
 
 [10]
 

 In
 
 Bremner
 
 , the plaintiff filed a complaint seeking a declaratory judgment to void several
 ordinances that revised the guidelines relating to the development of and zoning in Waikiki, Honolulu, Hawai'i.
 
 96 Hawai'i at 138
 
 ,
 
 28 P.3d at 354
 
 . The trial court dismissed the plaintiff's complaint, ruling that the plaintiff did not establish that he had standing to seek declaratory relief.
 

 Id.
 

 Guided by the well-established considerations in Hawai'i law concerning standing,
 
 [11]
 
 the ICA
 
 [12]
 
 concluded that the plaintiff did not have standing because he did not establish that he had suffered an "injury in fact" due to the enactment of the disputed ordinances.
 
 See
 

 id.
 

 at 141-42
 
 ,
 
 28 P.3d at 357-58
 
 . Although the plaintiff alleged that the ordinances would result in overcrowding, require the installment of an upgraded sewer system, which would be expensive and harm the economy, and place a strain on the environment, the ICA determined that these allegations did not establish that the plaintiff had actually suffered any personal, judicially cognizable injury.
 

 Id.
 

 The ICA explained:
 

 [The plaintiff], a Kailua resident, did not allege that he lives or works in or anywhere near Waikiki. He claimed no property interest in Waikiki or its environs. He did not identify any specific, personal, aesthetic or recreational interest derogated by the zoning ordinance that may warrant standing .... Nor did he assert any cultural or religious ties to the area .... Finally, ... [the plaintiff] did not allege that future high density development in Waikiki might tangentially affect his property interests.
 

 Id.
 

 at 142
 
 ,
 
 28 P.3d at 358
 
 .
 

 The ICA also reconciled its application of the traditional standing principles with the policy declarations outlined in HRS §§ 632-1 and 632-6, reasoning:
 

 [W]e are also confident that our application of the principles of standing in this case in no way runs afoul of the legislative declaration of policy contained in HRS ch. 632.
 
 See
 

 Life of the Land II
 
 ,
 
 63 Haw. at
 
 172 n.5,
 
 623 P.2d at
 
 438 n.5. Because [the plaintiff] fails to allege a judicially cognizable injury, we cannot say that an "actual controversy exists between contending parties" that would qualify [the plaintiff] for declaratory relief, any more than we can say that citizens often disagree with actions taken by their elected representatives. HRS § 632-1. The same reason prevents us from being "satisfied that antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation[.]"
 

 Id.
 

 Nor can we be convinced that [the plaintiff] "asserts a legal relation, status, right, or privilege in which [he] has a concrete interest[,]" absent a specific allegation of personal and particularized harm.
 
 Id.
 
 ...
 

 We recognize that HRS ch. 632 is to be "liberally interpreted and administered, with a view to making the courts more serviceable to the people[,]" HRS § 632-6, but nowhere does the law suggest that this admonition trumps the standing requirement of a "personal stake" or an "injury in fact." The specific harm which our standing doctrine requires, and which [the plaintiff] failed to allege, by no means interposes an excessive burden
 upon plaintiffs who seek the services of the courts. Rather, the requirement ensures that judicial intervention will be within the particular capabilities of the courts, and be not constitutional folly.
 

 Id.
 
 at 143,
 
 28 P.3d at 359
 
 (all but first brackets in original).
 

 Put succinctly, the ICA explained that the application of traditional standing principles, including the three-part "injury in fact" test, to determine whether plaintiffs have standing to bring a declaratory action, did not contravene HRS §§ 632-1 or 632-6.
 
 See
 

 id.
 

 According to the
 
 Bremner
 
 court, a plaintiff who fails to establish that he or she has suffered "a judicially cognizable injury" will also not be able to demonstrate that his or her case meets the requirements of HRS § 632-1.
 

 Id.
 

 The
 
 Bremner
 
 court also observed that requiring plaintiffs to demonstrate that they have suffered an "injury in fact" did not run afoul of the legislative mandate in HRS § 632-6 because such a requirement did not impose an undue burden on plaintiffs seeking to avail themselves of judicial relief, and was necessary to ensure that courts resolve cases that are appropriately within their domain.
 

 Id.
 

 5. Conclusion
 

 For the reasons set forth above, I respectfully disagree that HRS § 632-1 establishes a distinct test for standing or conflicts with the prudential requirement that a plaintiff demonstrate an injury in fact. Removal of this requirement in actions for declaratory relief marks a departure from a long history of judicial intervention only in justiciable controversies that are presented in an adversary context. Accordingly, although I conclude that Tax Foundation has standing, HRS § 632-1 does not itself create the test to be applied.
 

 DISSENTING OPINION BY NAKAYAMA, J.
 

 Plaintiff-Appellant Tax Foundation of Hawai'i (Tax Foundation) filed a class action lawsuit on behalf of all taxpayers in the City and County of Honolulu (the City), alleging that Defendant-Appellee State of Hawai'i (the State) violated Hawai'i Revised Statutes (HRS) § 248-2.6 and several provisions in the Hawai'i and United States Constitutions by retaining 10% of the gross proceeds of the City's surcharge on state general excise and use taxes as reimbursement for the costs of administering the surcharge on the City's behalf. On motion by the State, the Circuit Court of the First Circuit (circuit court) dismissed Tax Foundation's complaint, ruling that it lacked subject matter jurisdiction to entertain the dispute pursuant to HRS § 632-1.
 

 We are faced with the following issues on appeal: (1) whether the circuit court correctly concluded that it lacked subject matter jurisdiction over the present case; (2) whether Tax Foundation demonstrated that it had standing to challenge the State's administration of HRS § 248-2.6 ; (3) whether the State violated HRS § 248-2.6 in retaining 10% of the surcharge proceeds as reimbursement for the costs of administering the surcharge on the City's behalf; and (4) whether the State's implementation of HRS § 248-2.6 was unconstitutional.
 

 I join the Majority in its threshold holdings that: (1) Tax Foundation's requested relief does not constitute a tax refund claim; and (2) that HRS § 632-1 does not bar subject matter jurisdiction in this suit. Majority at Part I.
 

 Justice McKenna, writing for the Majority on the issue of standing, next holds that Tax Foundation has standing under HRS § 632-1. Majority at Part II. I dissent from Part II, as I agree with the Chief Justice's dissent to the extent that the Chief Justice concludes HRS § 632-1 does not eliminate the requirement that a plaintiff establish an "injury in fact" in a declaratory judgment, and therefore does not establish a distinct test for standing.
 

 I disagree with the Chief Justice to the limited extent that I believe that Tax Foundation did not raise taxpayer standing, and that the Chief Justice considers whether Tax Foundation has taxpayer standing
 
 sua sponte
 
 . I believe that the Chief Justice's
 
 sua sponte
 
 consideration of whether Tax Foundation possessed taxpayer standing is inappropriate for two reasons. First, I believe that
 the Chief Justice's decision to address whether Tax Foundation possessed taxpayer standing
 
 sua sponte
 
 is inconsistent with our case law. This court has previously declined to entertain whether a plaintiff possesses standing as a taxpayer when the plaintiff does not expressly rely upon such a basis for standing. Second, I believe that by effectively raising an alternative theory of standing on Tax Foundation's behalf, the Chief Justice undermines the principle of party presentation that lies at the core of the adversarial process. Therefore, I write separately because, as Tax Foundation itself proffers no other basis for standing, I would hold that Tax Foundation has failed to establish that it has standing to challenge the State's implementation of HRS § 248-2.6.
 

 Finally, the Majority addresses Tax Foundation's arguments on the merits. Majority at Part III. I cannot join the Majority's holding in Part III because as I believe Tax Foundation lacks standing, I would not reach the merits of Tax Foundation's arguments.
 

 I. DISCUSSION
 

 A. This court should not
 
 sua sponte
 
 consider taxpayer standing.
 

 The State raised standing as an issue at trial and on appeal, but no party elected to raise taxpayer standing specifically. The Chief Justice nevertheless concludes that Tax Foundation "directly invokes the principles of taxpayer standing,"
 
 [1]
 
 and proceeds to apply the two-part test
 
 [2]
 
 that governs whether an individual has standing as a taxpayer to the facts in this case. Dissenting Opinion by Recktenwald, C.J., at 7-9. The Chief Justice then determines that Tax Foundation satisfied both requirements, and thus, has taxpayer standing to challenge the State's application of HRS § 248-2.6. Dissenting Opinion by Recktenwald, C.J., at 7-11. I respectfully disagree.
 

 I do not believe Tax Foundation effectively raised taxpayer standing. The Chief Justice points to statements made by Tax Foundation such as, "as a taxpayer, [Tax Foundation is] continuously injured by the State[,]" and "[t]he Foundation has paid the Surcharge and is vitally invested in its proper use considering it will be continually taxed for the same until the rail project is finished." Dissenting Opinion by Recktenwald, C.J., at 7. However, this court has consistently declined to consider taxpayer standing as a basis for standing
 
 where plaintiffs do not explicitly allege taxpayer standing
 
 .
 
 See
 

 infra
 
 . Such an explicit allegation of taxpayer standing is absent here. Therefore, in my view, the Chief Justice addresses the issue of taxpayer standing
 
 sua sponte
 
 .
 

 Respectfully, I believe that the Chief Justice's
 
 sua sponte
 
 consideration of taxpayer standing is misguided for two reasons. First, the Chief Justice's decision is inconsistent with our case law. Second, the Chief Justice's decision undermines the principle of party presentation that is fundamental to our adversarial process.
 

 This court has previously declined to consider whether a plaintiff has standing as a taxpayer when the plaintiff has not expressly alleged taxpayer standing. For example, in
 
 Mottl v. Miyahira
 
 , this court suggested that where plaintiffs do not explicitly allege taxpayer standing as a basis for standing, such a theory will not be considered in determining whether they have standing.
 
 See
 

 95 Hawai'i 381
 
 , 391 n.13,
 
 23 P.3d 716
 
 , 726 n.13 (2001). There, the plaintiffs, consisting of a labor union representing University of Hawai'i (University) faculty members, several University faculty members, and a member each of the Hawai'i State Senate and the Hawai'i State House of Representatives, filed a complaint against the defendants, the director of finance of the State and the governor of the State.
 

 Id.
 

 at 383-85
 
 ,
 
 23 P.3d at 718-20
 
 . In brief, the plaintiffs alleged that the defendants had illegally encumbered $6.4 million that should have been allocated to the University's budget, and sought,
 
 inter alia
 
 , declaratory and injunctive relief whereby the previously withheld funds would be distributed to the University.
 

 Id.
 

 at 385
 
 ,
 
 23 P.3d at 720
 
 . One of the issues on appeal was whether the plaintiffs had shown that they had suffered an "injury in fact" as a result of the defendants' conduct.
 
 See
 

 id.
 

 at 388-95
 
 ,
 
 23 P.3d at 723-30
 
 .
 

 This court held that the plaintiffs lacked standing to seek the disbursement of the allegedly improperly encumbered funds on behalf of the University, explaining:
 

 The plaintiffs do not attempt to prove any specific and personal injury but, rather, press their general proposition that, in any organization, a loss of six million dollars from its budget must have
 
 some
 
 negative effect on its operations, ultimately affecting all of its employees. Their argument calls for assumptions or inferences that are not supported by the record or any case law that the plaintiffs cite. Accordingly, the injury that the plaintiffs assert is "abstract, conjectural, or merely hypothetical."
 

 Id.
 

 at 395
 
 ,
 
 23 P.3d at 730
 
 (emphasis in original).
 

 Though this court's conclusion that the plaintiffs lacked standing rested on their arguments that they met the traditional three-prong "injury in fact" test, the
 
 Mottl
 
 court also noted that the plaintiffs could not rely upon a theory of taxpayer standing to establish that they had standing to invoke judicial intervention.
 

 Id.
 

 at 391 n.13,
 
 23 P.3d at
 
 726 n.13. Acknowledging the two-part test that governs whether a plaintiff has taxpayer standing, this court reasoned:
 

 The individual plaintiffs in the present matter alleged in their complaint that they were taxpayers, but
 
 they did not expressly claim general taxpayer standing
 
 , let alone any recognized "special circumstances." Insofar as they have not alleged that they suffered any pecuniary loss as a result of [the defendants'] actions, the circuit court's exercise of jurisdiction over their complaint may not be justified on the ground that they were taxpayers.
 

 Id.
 

 (emphasis added). Put differently, inasmuch as the plaintiffs neither explicitly claimed that they had standing by way of taxpayer standing, nor alleged any facts or arguments supporting that they had standing as taxpayers, this court did not consider taxpayer standing as a means for establishing that they had standing to seek declaratory and injunctive relief.
 
 See
 

 id.
 

 More recently, in
 
 Corboy v. Louie
 
 ,
 
 128 Hawai'i 89
 
 ,
 
 283 P.3d 695
 
 (2011), this court reiterated that it will not consider whether a plaintiff has taxpayer standing when the issue has not been
 
 expressly
 
 raised. In
 
 Corboy
 
 , the plaintiffs alleged that real property tax exemptions awarded to Hawaiian homestead lessees under the Hawaiian Homes Commission Act (HHCA) involved unconstitutional discrimination on the basis of race, insofar as the HHCA provided that only native Hawaiians were eligible to become homestead lessees.
 
 128 Hawai'i at 90
 
 ,
 
 283 P.3d at 696
 
 .
 

 This court held that the plaintiffs did not have standing to challenge the constitutionality of the real property tax exemption or the HHCA generally because they "have failed to allege an injury-in-fact with regard to the HHCA's native Hawaiian ancestry qualification for homestead lessees."
 

 Id.
 

 at 103
 
 ,
 
 283 P.3d at 709
 
 . Additionally, having determined that the plaintiffs were unable to establish standing on traditional grounds, the
 
 Corboy
 
 court refrained from considering the issue of taxpayer standing, reasoning: "We decline to reach the issue ... of whether [the plaintiffs] have general taxpayer standing to assert their claims. Although each of the individual plaintiffs allege that they are taxpayers,
 
 they do not expressly claim general taxpayer standing
 
 . Accordingly, we need not address this theory."
 

 Id.
 

 at 106 n.32,
 
 283 P.3d at
 
 712 n.32 (citations omitted) (emphasis added). Consequently, given that the plaintiffs did not demonstrate that they had standing by virtue of the three-part "injury in fact" test, nor did they allege that they had standing as taxpayers, this court concluded that the plaintiffs lacked standing to bring their constitutional challenges, and that it need not consider the plaintiffs' claims on the merits.
 
 See
 

 id.
 

 at 103
 
 , 106 n.32, 108,
 
 283 P.3d at 709
 
 , 712 n.32, 714.
 

 Thus,
 
 Mottl
 
 and
 
 Corboy
 
 instruct that where a plaintiff does not expressly allege that the plaintiff has standing on the basis of taxpayer standing, this court should not consider the issue, but should resolve the issue of standing based upon the arguments that the parties actually present. Here, as in
 
 Mottl
 
 and
 
 Corboy
 
 , although Tax Foundation has alleged that it is a taxpayer, it has not, at any point, expressly averred that it has standing by way of taxpayer standing. Rather, Tax Foundation has consistently and exclusively argued that it has standing to challenge the State's implementation of HRS § 248-2.6 because it satisfied the three requirements of the traditional "injury in fact" test for standing. Accordingly,
 
 Mottl
 
 and
 
 Corboy
 
 instruct that this court need not and should not address whether Tax Foundation has taxpayer standing.
 

 Moreover, this court has never
 
 sua sponte
 
 raised the issue of taxpayer standing to conclude an entity had standing on that basis. In
 
 Mottl
 
 and
 
 Corboy
 
 , this court held that the entities lacked standing based on the traditional test, and declined to consider taxpayer standing because the parties failed to expressly raise the issue.
 
 Mottl
 
 , 95 Hawai'i at 391 n.13,
 
 23 P.3d at
 
 726 n.13 ;
 
 Corboy
 
 ,
 
 128 Hawai'i at
 
 106 n.32,
 
 283 P.3d at
 
 712 n.32. This court raised,
 
 sua sponte
 
 , the issue of taxpayer standing in
 
 Wilson v. Stainback
 
 to conclude that the entity
 
 did not have standing
 
 .
 
 39 Haw. 67
 
 , 70 (Haw. Terr. 1951). In
 
 Bulgo v. Cty. of Maui
 
 and
 
 Hawaii's Thousand Friends v. Anderson
 
 , this court ruled on whether an entity had taxpayer standing after the issue had been properly raised by the parties.
 
 See
 

 Bulgo
 
 ,
 
 50 Haw. 51
 
 , 55,
 
 430 P.2d 321
 
 , 324 (1967) (holding the entity had taxpayer standing);
 
 Hawaii's Thousand Friends
 
 ,
 
 70 Haw. 276
 
 , 281,
 
 768 P.2d 1293
 
 , 1298 (1989) (holding the entity lacked taxpayer standing). These cases suggest that this court should, if it
 
 sua sponte
 
 raises the issue of taxpayer standing, do so only to determine an entity
 
 lacks standing
 
 . The Chief Justice's decision to
 
 sua sponte
 
 consider the matter and conclude that Tax Foundation has taxpayer standing is therefore inconsistent with our case law on this point.
 

 Additionally, I believe that the Chief Justice's
 
 sua sponte
 
 consideration of whether Tax Foundation has taxpayer standing undermines the principle of party presentation that lies at the heart of our adversarial process. Under the principle of party presentation, courts "rely on the parties to frame the issues for decision" and are "assign[ed] ... the role of neutral arbiter of matters the parties present."
 
 Greenlaw v. United States
 
 ,
 
 554 U.S. 237
 
 , 243,
 
 128 S.Ct. 2559
 
 ,
 
 171 L.Ed.2d 399
 
 (2008) ;
 
 Carducci v. Regan
 
 ,
 
 714 F.2d 171
 
 , 177 (D.C. Cir. 1983) ("The premise of our adversarial system is that appellate courts ... [sit as] arbiters of legal questions presented and argued by the parties before them."). In circumstances where a court appears to raise arguments on behalf of one of the parties, "the court may cease to appear as a neutral arbiter, and that could be damaging to our system of justice."
 
 Burgess v. United States
 
 ,
 
 874 F.3d 1292
 
 , 1300 (11th Cir. 2017).
 

 The Chief Justice invokes taxpayer standing as alternative grounds for satisfying Tax Foundation's burden to illustrate that it has standing.
 
 See
 

 Haw. Med. Ass'n v. Haw. Med. Serv. Ass'n, Inc.
 
 ,
 
 113 Hawai'i 77
 
 , 95,
 
 148 P.3d 1179
 
 , 1197 (2006) ("[A]lthough lack of standing is raised by the defendant,
 
 the plaintiff bears the burden of establishing that he or she has standing
 
 ." (emphasis added)). In so doing, the Chief Justice supplies Tax Foundation
 with a legal theory upon which it could have, but did not, rely to show that it had standing to challenge the State's implementation of HRS § 248-2.6.
 

 By raising such a legal theory on Tax Foundation's behalf and effectively shouldering Tax Foundation's burden to demonstrate that it has standing, the Chief Justice appears to stray from acting as a "neutral arbiter of matters the parties present" in this case.
 
 Greenlaw
 
 ,
 
 554 U.S. at 243
 
 ,
 
 128 S.Ct. 2559
 
 ;
 
 see also
 

 Burgess
 
 ,
 
 874 F.3d at 1300
 
 . I fear that such action runs the risk of "disincentiviz[ing] vigorous advocacy,"
 
 United States v. Oliver
 
 ,
 
 878 F.3d 120
 
 , 127 (4th Cir. 2017), and undermines the principle of party presentation.
 
 See
 

 Greenlaw
 
 ,
 
 554 U.S. at 243
 
 ,
 
 128 S.Ct. 2559
 
 . In light of these concerns, and because the Chief Justice does not adequately explain how this case presents an exceptional circumstance that warrants a departure from the bedrock principle of party presentation,
 
 [3]
 
 I cannot join his decision to
 
 sua sponte
 
 consider whether Tax Foundation possessed taxpayer standing.
 

 II. CONCLUSION
 

 I agree with the Chief Justice's analysis of HRS § 632-1. HRS § 632-1 does not set forth a new test for establishing standing in the context of declaratory relief and does not dispense with the "injury in fact" requirement of the traditional standing analysis.
 

 However, because Tax Foundation itself does not proffer an alternative basis for satisfying its burden of demonstrating that it has standing, I would hold that Tax Foundation does not have standing to challenge the State's implementation of HRS § 248-2.6.
 

 Accordingly, I join Part I of the Majority opinion, but do not reach the merits of Tax Foundation's argument, which the Majority addresses in Part III. I agree with the Chief Justice's dissenting opinion to the extent that the Chief Justice concludes HRS § 632-1 does not establish a distinct test for standing. However, I write separately to express my concerns regarding the Chief Justice's
 
 sua sponte
 
 consideration of taxpayer standing, and therefore cannot join that part of his opinion.
 

 Chief Justice Recktenwald, joined by Justices Nakayama, McKenna, Pollack, and Wilson, writes for the majority of the court in Part One. Justice McKenna, joined by Justices Pollack and Wilson, writes for the majority of the court with respect to Part Two. Chief Justice Recktenwald, joined by Justices McKenna, Pollack, and Wilson, writes for the majority of the court in Part Three.
 

 Nothing in the record shows that the class was certified.
 

 The following factual allegations taken from the complaint appear to be uncontested.
 

 We note that Act 1 (S.B. 4), 29th Leg., 1st Spec. Sess. (2017), was enacted on September 5, 2017, and among other things, amended the State's withholding from 10% to 1% of gross proceeds of the surcharge. This newly enacted legislation postdates the period at issue here, and therefore does not affect our consideration of the State's previous application of HRS § 248-2.6. To avoid confusion, all references to the surcharge withholding under HRS § 248-2.6(a) in this opinion will be to the 10% figure.
 

 Act 213, SLH 2007, § 121 required DOTAX to provide two years of reporting that detailed the level of staffing and funding necessary to administer county surcharge collections. DOTAX reported that the total amount budgeted for staffing positions was $749,876 for the 2008 fiscal year and $700,508 for the 2009 fiscal year. Apart from the 2008 and 2009 fiscal years, it appears undisputed that DOTAX has not calculated the actual costs incurred in assessing, collecting, and distributing the surcharge, asserting that it is not "necessary or required" to perform such an analysis.
 

 HRS § 632-1 provides in relevant part:
 

 In cases of actual controversy, courts of record, within the scope of their respective jurisdictions, shall have power to make binding adjudications of right, whether or not consequential relief is, or at the time could be, claimed, and no action or proceeding shall be open to objection on the ground that a judgment or order merely declaratory of right is prayed for;
 
 provided that declaratory relief may not be obtained in any district court, or in any controversy with respect to taxes
 
 , or in any case where a divorce or annulment of marriage is sought.
 
 Controversies involving the interpretation of
 
 deeds, wills, other instruments of writing,
 
 statutes
 
 , municipal ordinances, and other governmental regulations,
 
 may be so determined
 
 , and this enumeration does not exclude other instances of actual antagonistic assertion and denial of right.
 

 (Emphasis added.)
 

 HRS § 40-35(b) provides that "[a]ny action to recover payment of taxes under protest shall be commenced in the tax appeal court."
 

 HRS § 232-14.5(a) provides that "[t]he denial in whole or in part by the department of taxation of a tax refund claim may be appealed by the filing of a written notice of appeal to a board of review or the tax appeal court within thirty days after notice of the denial of the claim."
 

 HRS § 632-1(a) provides, in relevant part:
 

 [D]eclaratory relief may not be obtained in any district court, or in any controversy with respect to taxes .... Controversies involving the interpretation of ... statutes ... may be so determined[.]
 

 HRCP Rule 15(a) (2012) provides in pertinent part:
 

 Amendments before trial.
 

 (1) AMENDING AS A MATTER OF COURSE. A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served ...
 

 (2) OTHER AMENDMENTS. In all other cases, a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires....
 

 Since we conclude that the circuit court had jurisdiction,
 
 see
 

 infra
 
 , we do not address this argument further.
 

 The three-part test used to determine whether a plaintiff has standing is whether: (1) the plaintiff has suffered "an actual or threatened injury" as a result of the defendant's wrongful conduct, (2) the injury is fairly traceable to the defendant's actions, and (3) a favorable decision would likely provide relief for the plaintiff's injury.
 
 Sierra Club
 
 ,
 
 100 Hawai'i at 250
 
 ,
 
 59 P.3d at 885
 
 (citation omitted).
 

 In previous cases involving the issue of subject matter jurisdiction under the tax exclusion provision of HRS § 632-1, this court has applied various tests to determine whether the funds at issue were a tax and therefore subject to HRS § 632-1 's exclusionary provision, or a fee and therefore not subject to the exclusion.
 
 See, e.g.
 
 ,
 
 Hawaii Insurers Council v. Lingle
 
 ,
 
 120 Hawai'i 51
 
 , 64-66,
 
 201 P.3d 564
 
 , 577-79 (2008). As discussed
 
 infra
 
 , we conclude that this is not a "controversy with respect to taxes" within the meaning of HRS § 632-1 because the prohibition against tax controversies does not apply if the declaratory relief sought does not interfere with the government's ability to assess and collect taxes. We therefore do not make a determination on whether the funds retained by the State are appropriately characterized as a tax or a fee, because even as a tax, this is still not a prohibited tax controversy. Accordingly, the circuit court had subject matter jurisdiction to hear Tax Foundation's claim.
 

 See
 

 Life of the Land II
 
 ,
 
 63 Haw. at 172
 
 ,
 
 623 P.2d at
 
 438 ;
 
 see
 

 also,
 

 e.g.
 
 ,
 
 Asato v. Procurement Policy Bd.
 
 ,
 
 132 Hawai'i 333
 
 , 364,
 
 322 P.3d 228
 
 , 259 (2014) ;
 
 Sierra Club v. Dep't of Transp.
 
 ("
 
 Superferry I"
 
 ),
 
 115 Hawai'i 299
 
 , 321,
 
 167 P.3d 292
 
 , 314 (2007) ;
 
 Citizens for Protection of North Kohala Coastline v. Cnty. of Hawai'i
 
 ,
 
 91 Hawai'i 94
 
 , 100,
 
 979 P.2d 1120
 
 , 1126 (1999).
 

 See
 
 Corboy v. Louie
 
 ,
 
 128 Hawai'i 89
 
 , 104,
 
 283 P.3d 695
 
 , 710 (2011), which is cited to in the Chief Justice's Dissenting Opinion. Dissenting Opinion by Recktenwald, C.J. ("Dissent").
 
 Corboy
 
 involved a request for refund under HRS §§ 40-35(b) and 232-3 of taxes paid under protest; although the plaintiff also sought declaratory relief regarding the bases for requesting a refund,
 
 see
 
 Corboy,
 
 128 Hawai'i at 94
 
 ,
 
 283 P.3d at 700
 
 , HRS § 632-1 was not discussed in the opinion. The Dissent characterizes the "injury in fact" test as the "traditional injury in fact" analysis, also citing
 
 Superferry I
 
 ,
 
 115 Hawai'i at 319
 
 ,
 
 167 P.3d at 312
 
 .
 
 Superferry I
 
 arose out of the Hawai'i Environmental Policy Act, HRS Chapter 343, and did not involve HRS § 632-1.
 
 See
 

 Superferry I
 
 ,
 
 115 Hawai'i at 304
 
 ,
 
 167 P.3d at 297
 
 .
 

 The Dissent concludes that Tax Foundation has "taxpayer standing."
 
 See
 

 infra
 
 notes 35 & 39. Justice Nakayama agrees with the Chief Justice that HRS § 632-1 does not set out a test for standing, but she would not address taxpayer standing based on
 
 Mottl v. Miyahira
 
 ,
 
 95 Hawai'i 381
 
 ,
 
 23 P.3d 716
 
 (2001), and
 
 Corboy
 
 ,
 
 128 Hawai'i 89
 
 ,
 
 283 P.3d 695
 
 , in which we did not consider general taxpayer standing when that basis for standing had not been expressly argued.
 
 See
 

 Mottl
 
 ,
 
 95 Hawai'i at
 
 391 n.13,
 
 23 P.3d at
 
 726 n.13 ;
 
 Corboy
 
 ,
 
 128 Hawai'i at
 
 106 n.32,
 
 283 P.3d at
 
 712 n.32.
 

 The State cites to
 
 Sierra Club v. Hawai'i Tourism Authority
 
 ,
 
 100 Hawai'i 242
 
 ,
 
 59 P.3d 877
 
 (2002) (plurality opinion), to assert that Tax Foundation must meet the three-part "injury in fact" test for standing.
 
 Sierra Club
 
 was not an HRS § 632-1 lawsuit, but instead involved a request for declaratory relief under HRS § 201B-15 (Supp. 2000), which then provided in relevant part:
 

 [A]ny action or proceeding to which the authority, the State, or the county may be party, in which any question arises as to the validity of this chapter or any portion of this chapter, or any action of the authority may be filed....
 

 This language differs significantly from HRS § 632-1, which is quoted and discussed more extensively below.
 

 The State also cites to
 
 Akinaka v. Disciplinary Board of the Hawai'i Supreme Court
 
 ,
 
 91 Hawai'i 51
 
 ,
 
 979 P.2d 1077
 
 (1999) (per curiam), for the additional proposition that "one does not have standing to assert a violation of rights belonging to another, since the person entitled to a right is the only one who can be
 
 directly
 
 injured by its deprivation." 91 Hawai'i at 58, 979 P.2d at 1084 (citation omitted).
 
 Akinaka
 
 is inapposite, as it dealt with an opposing party seeking to compel attorney disciplinary proceedings.
 
 See
 
 91 Hawai'i at 53, 979 P.2d at 1079. We held that the complainant lacked standing because he had "no recognizable interest in the outcome of the ... investigation" and was therefore not injured. 91 Hawai'i at 58, 979 P.2d at 1085.
 

 Furthermore, if lack of standing was an issue of subject matter jurisdiction, it could not be waived, and a case in which a plaintiff lacks standing would have to be dismissed. Hawai'i Rules of Civil Procedure ("HRCP") Rule 12(h)(3) (2000) provides that "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."
 
 See
 

 also
 

 Chun v. Emps.' Ret. Sys.
 
 ,
 
 73 Haw. 9
 
 , 14,
 
 828 P.2d 260
 
 , 263 (1992),
 
 reconsideration
 

 denied
 
 ,
 
 73 Haw. 625
 
 ,
 
 829 P.2d 859
 
 (1992) ("[L]ack of subject matter jurisdiction can never be waived by any party at any time." (citation omitted)). We have noted, however, that a claim of lack of standing can be waived.
 
 See
 

 Ito v. Inv'rs Equity Life Holding Co.
 
 ,
 
 135 Hawai'i 49
 
 , 59 n.24,
 
 346 P.3d 118
 
 , 128 n.24 (2015) ("In its Reply Brief ... IELHC again claims that HLDIGA does not have standing .... However, this argument was waived on appeal because IELHC did not raise it in its opening brief." (citation omitted));
 
 see
 

 also
 

 In re Tax Appeal of Univ. of Hawai'i v. City & Cty. of Honolulu
 
 ("
 
 In re Univ. of Hawai'i
 
 "),
 
 102 Hawai'i 440
 
 , 445 n.13,
 
 77 P.3d 478
 
 , 483 n.13 (2003) ("We do not address the issue of whether the University has standing to appeal pursuant to a specific statute, inasmuch as the University did not raise this issue on appeal." (citation omitted)). Both
 
 Ito
 
 and
 
 In re Univ. of Hawai'i
 
 cited to Hawai'i Rules of Appellate Procedure ("HRAP") Rule 28(b)(7) in support of this point, which provides that "[p]oints not argued may be deemed waived."
 

 It appears the line of cases erroneously suggesting that standing is a matter of subject matter jurisdiction started with
 
 State v. Kam
 
 ,
 
 69 Haw. 483
 
 , 488,
 
 748 P.2d 372
 
 , 375-76 (1988) ("Although the question of standing 'was not raised by the parties, appellate courts are under an obligation to insure that they have jurisdiction to hear and determine each case.' " (citation omitted)). Subsequent cases include
 
 Akinaka
 
 ,
 
 91 Hawai'i at 55
 
 , 979 P.2d at 1081 ;
 
 Keahole
 
 ,
 
 110 Hawai'i at 427-28
 
 ,
 
 134 P.3d at
 
 593-94 ;
 
 Hui Kako'o Aina Ho'opulapula v. Board of Land & Natural Resources
 
 ,
 
 112 Hawai'i 28
 
 , 59,
 
 143 P.3d 1230
 
 , 1261 (2006) ; and
 
 McDermott v. Ige
 
 ,
 
 135 Hawai'i 275
 
 , 283,
 
 349 P.3d 382
 
 , 390 (2015).
 

 The conflation of the subject matter jurisdiction and justiciability implications of standing may have arisen due to language in our precedent stating that it would not be proper to "invoke a court's jurisdiction" where a plaintiff lacks standing.
 
 See, e.g.
 
 ,
 
 Mottl
 
 ,
 
 95 Hawai'i at 389
 
 ,
 
 23 P.3d at 724
 
 ("It is well settled that the crucial inquiry with regard to standing is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his or her invocation of the court's jurisdiction and to justify exercise of the court's remedial powers on his or her behalf." (
 
 quoting
 

 Akinaka
 
 , 91 Hawai'i at 55, 979 P.2d at 1081 )).
 

 The Dissent opines that HRS § 632-1, which is entitled "Jurisdiction; controversies subject to" does not set out standing requirements but is merely a jurisdictional statute. Yet, the Dissent acknowledges we have stated that HRS Chapter 632 is an instance in which standing requirements have been "tempered, or even prescribed, by legislative declarations of policy[,]" citing
 
 Life of the Land II
 
 ,
 
 63 Haw. at
 
 172 & n.5,
 
 623 P.2d at
 
 438 & n.5. It is difficult to understand how the legislature "tempered, or even prescribed" standing requirements in Chapter 632, if Chapter 632 does not actually contain standing criteria or requirements.
 

 As noted in Justice Acoba's dissenting opinion in
 
 County of Hawai'i v. Ala Loop Homeowners
 
 ,
 
 123 Hawai'i 391
 
 ,
 
 235 P.3d 1103
 
 (2010) :
 

 [S]ince its enactment in 1921, HRS § 632-1 has undergone several amendments. In 1945, a pertinent amendment was made to HRS § 632-1 with the intent "to expand the proceedings for declaratory judgments to a scope that will render such proceedings of real value[.]" S. Stand. Comm. Rep. No. 235, in 1945 Senate Journal, at 656. Furthermore, the House Committee on the Judiciary noted that the amendment would "afford greater relief by declaratory judgment than the present law." H. Stand. Comm. Rep. No. 76, in 1945 House Journal, at 566. This court has recently determined that, by this amendment, the legislature "intended to 'afford [citizens] greater relief,' " and, therefore, a petitioner was not precluded "from bringing a declaratory judgment action under the current HRS § 632-1, even though [relief through another right of action was] available provided that 'the other essentials to such relief [were] present.' "
 
 Dejetley v. Kaho'ohalahala
 
 ,
 
 122 Hawai'i 251
 
 , 268,
 
 226 P.3d 421
 
 , 438 (2010) (quoting HRS § 632-1 ).
 

 123 Hawai'i at 434
 
 ,
 
 235 P.3d at 1146
 
 (Acoba, J., dissenting).
 

 In 1921, when Hawai'i's declaratory judgment act was enacted, district courts were not courts of record. Effective January 1, 1972, Act 188, 1970 Hawaii Sess. Laws 443, established district courts as courts of record and redesignated district magistrates as district judges.
 
 See
 

 State v. Okuda
 
 ,
 
 71 Haw. 434
 
 , 438 n.6,
 
 795 P.2d 1
 
 , 4 n.6 (1990) (per curiam).
 

 Our discussion does not include the repeated phrase that "the court is satisfied." Interestingly, there are numerous federal cases relating a "court is satisfied" with standing or standing requirements.
 
 See, e.g.
 
 ,
 
 Spokeo, Inc. v. Robins
 
 , --- U.S. ----,
 
 136 S.Ct. 1540
 
 , 1550,
 
 194 L.Ed.2d 635
 
 (2016) ("The [Ninth Circuit Court of Appeals] thus concluded that Robins' 'alleged violations of his statutory rights were sufficient to satisfy the injury-in-fact requirement of Article III.' " (internal brackets and citation omitted));
 
 Walker v. Lamb
 
 , Case No. 4:18-cv-04094,
 
 2019 WL 542328
 
 , at *7 (W.D. Ark. Feb. 11, 2019) ("[T]he Court is satisfied that Plaintiff has standing to bring the present lawsuit.");
 
 Am. Fed'n of State, Cty. & Mun. Emps. (AFSCME) Council 79 v. Scott
 
 ,
 
 278 F.R.D. 664
 
 , 668-69 (S.D. Fla. 2011) ("The Court is satisfied that the Union has demonstrated an injury in fact.... [T]he Court is satisfied that the Union satisfies the last two standing prongs.");
 
 White v. Engler
 
 ,
 
 188 F.Supp.2d 730
 
 , 743 (E.D. Mich. 2001) ("The Court is satisfied that Plaintiffs have standing to pursue such action. The Court is also satisfied that the NAACCP has standing to pursue this action on behalf of its members.").
 

 Declaratory relief ordinarily cannot be utilized to enjoin the enforcement of a valid criminal statute, but may be available where a criminal statute affects a continuing course of conduct but is not subject to challenge in a criminal court because the government refuses to bring criminal proceedings.
 
 See
 

 Pacific Meat Co. v. Otagaki
 
 ,
 
 47 Haw. 652
 
 , 656,
 
 394 P.2d 618
 
 , 620-21 (1964).
 

 The Dissent opines that because HRS § 632-1 does not use language such as "an aggrieved party," "any interested person," or "any person" in describing who can bring a declaratory judgment action, it does not set out standing requirements. The language of subsection (b), however, clearly lays out when "parties" can bring a request for declaratory relief.
 

 HRS § 91-7 (2012 & Supp. 2014) provides in pertinent part:
 

 Declaratory judgment on validity of rules. (a) Any interested person may obtain a judicial declaration as to the validity of an agency rule as provided in subsection (b) by bringing an action against the agency in the circuit court or, if applicable, the environmental court, of the county in which the petitioner resides or has its principal place of business. The action may be maintained whether or not the petitioner has first requested the agency to pass upon the validity of the rule in question.
 

 The original 1961 version of the statute was in effect at the time of
 
 Asato
 
 ; in 2014, the legislature added "or, if applicable, the environmental court." 2014 Haw. Sess. Laws Act 218, § 3 at 739.
 

 The Dissent asserts that since
 
 Dalton
 
 , this court has consistently required a party seeking declaratory relief under HRS § 632-1 to establish an injury or a threatened injury. As noted by the Dissent, however,
 
 Dalton
 
 did not use the terms "injury" or "threatened injury." Rather,
 
 Dalton
 
 refers to "a 'concrete interest' in a 'legal relation,' " which are the terms specifically contained within the legislative prescription of HRS § 632-1.
 
 Dalton
 
 ,
 
 51 Haw. at 403
 
 ,
 
 462 P.2d at 202
 
 (citation omitted).
 

 The Dissent also cites to this passage. Although
 
 Life of the Land II
 
 did generally discuss this shift, it did so in the context of discussing United States Supreme Court cases discussing standing requirements in federal courts.
 
 See
 

 Life of the Land II
 
 ,
 
 63 Haw. at 172-73
 
 ,
 
 623 P.2d at 438-39
 
 (comparing
 
 Tennessee Electric Power Co. v. Tennessee Valley Authority
 
 ,
 
 306 U.S. 118
 
 , 137-38,
 
 59 S.Ct. 366
 
 ,
 
 83 L.Ed. 543
 
 (1939), with
 
 Association of Data Processing Service Organizations v. Camp
 
 ,
 
 397 U.S. 150
 
 , 153-54,
 
 90 S.Ct. 827
 
 ,
 
 25 L.Ed.2d 184
 
 (1970) ).
 

 Although
 
 Citizens
 
 used the phrase "injury in fact," it did not apply the three-part "injury in fact" test for HRS § 632-1 standing.
 

 Specifically:
 

 The complaint alleged: (1) a violation of the principle of separation of powers implicit in the Hawai'i Constitution by reducing, without authority, the budgetary allocation to the University of Hawai'i below the amount legislatively appropriated; and (2) a violation of HRS ch. 37 by (a) failure to restore to the University of Hawai'i an amount sufficient to pay the faculty paychecks on June 30, 1998 when the federal injunction precluded implementation of the payroll lag, (b) causing monies encumbered in fiscal year 1998 for the purchase of supplies, services, and other purposes to be diverted to the payment of salaries, and (c) causing the University of Hawaii's budget in fiscal year 1999 to be impaired by the cost shifted from the fiscal year 1998.
 

 Mottl
 
 ,
 
 95 Hawai'i at 385
 
 ,
 
 23 P.3d at 720
 
 .
 

 The Dissent opines that this court should follow the Intermediate Court of Appeals' ("ICA['s]") opinion in
 
 Bremner v. City & County of Honolulu
 
 ,
 
 96 Hawai'i 134
 
 ,
 
 28 P.3d 350
 
 (App. 2001), in which the ICA applied the three-part "injury in fact" test to determine HRS § 632-1 standing.
 
 Bremner
 
 , however, cited to
 
 Bush
 
 ,
 
 81 Hawai'i at 479
 
 ,
 
 918 P.2d at 1135
 
 , as authority for its application of the three-part "injury in fact" test to HRS § 632-1 standing.
 
 See
 

 Bremner
 
 ,
 
 96 Hawai'i at 139
 
 ,
 
 28 P.3d at 355
 
 . Yet
 
 Bush
 
 was brought under
 
 42 U.S.C. § 1983
 
 , not HRS § 632-1.
 
 See
 

 Bush
 
 ,
 
 81 Hawai'i at 477-78
 
 ,
 
 918 P.2d at 1133-34
 
 .
 
 Bremner
 
 also cited to
 
 Mottl
 
 as authority for its application of the three-part "injury in fact" test for HRS § 632-1 standing.
 
 See
 

 Bremner
 
 ,
 
 96 Hawai'i at 139
 
 ,
 
 28 P.3d at 355
 
 . As noted, however, it is unclear why
 
 Mottl
 
 applied the three-part "injury in fact" test to HRS § 632-1 standing, and, as discussed in this opinion, application of the test to declaratory relief actions under HRS Chapter 632 contravenes prudential considerations when the legislature has clearly delineated standing requirements under HRS § 632-1. Therefore, we decline to adopt
 
 Bremner
 
 , which is inconsistent with the language and legislative intent of HRS Chapter 632.
 

 The Chief Justice opines that HRS § 632-1 does not set out standing requirements and would hold that a party would usually need to satisfy the common law three-part "injury in fact" test to have standing to seek declaratory relief under HRS § 632-1. The Chief Justice does not address whether Tax Foundation would satisfy the three-party "injury in fact" test here and instead applies the common law two-part "taxpayer standing" test articulated in
 
 Hawaii's Thousand Friends v. Anderson
 
 ,
 
 70 Haw. 276
 
 , 283,
 
 768 P.2d 1293
 
 , 1299 (1989), that "(1) plaintiff must be a taxpayer who contributes to the particular fund from which the illegal expenditures are allegedly made; and (2) plaintiff must suffer a pecuniary loss [by the increase of the burden of taxation], which, in cases of fraud, are presumed." 70 Haw. at 282,
 
 768 P.2d at 1298
 
 . He opines that Tax Foundation satisfies both requirements for taxpayer standing in this case. It therefore appears that the Chief Justice considers "taxpayer standing" to be a more relaxed common law standing test than the three-part "injury in fact" test. "Taxpayer standing" clearly does not require a showing of the third prong of the "injury in fact" test - that "a favorable decision would likely provide relief for the plaintiff's injury."
 

 Our discussion of recent cases in Section IV.C.3.c, indicates that some of our decisions may have had that result.
 

 The Dissent asserts that construing HRS § 632-1 as delineating its own standing requirements "injects unnecessary complexity into a simple doctrine and a straightforward line of case law," and suggests that "stray[ing] from this court's precedent applying the 'injury in fact' test to HRS § 632-1 actions" constitutes a complexity about standing that creates a barrier to justice. The three-part "injury in fact" test for standing is, however, far from "simple" or "straightforward."
 
 See, e.g.
 
 , Juan Olano, Note,
 
 The Struggle to Define Privacy Rights and Liabilities in a Digital World and the Unfortunate Role of Constitutional Standing
 
 ,
 
 72 U. Miami L. Rev. 1025
 
 , 1038-43 (2018) (discussing "Constitutional Standing Requirements and the Confusing Injury-in-fact Jurisprudence"); F. Andrew Hessick,
 
 Standing, Injury in Fact, and Private Rights
 
 ,
 
 93 Cornell L. Rev. 275
 
 , 276 (2008) ("Although seemingly simple on its face, this [injury in fact] doctrine has produced an incoherent and confusing law of federal courts." (footnote omitted)).
 

 The Dissent states that "removal" of the "injury in fact" "requirement" "marks a departure from a long history of judicial intervention only in justiciable controversies that are presented in an adversary context." As discussed, however, there is no "long history" of the "injury in fact" requirement for standing in Hawai'i courts; the concept was introduced in 1981 in
 
 Life of the Land II
 
 , and not in the context of HRS § 632-1, but in the context of HRS § 91-7.
 
 See
 

 Life of the Land II
 
 ,
 
 63 Haw. at 173
 
 ,
 
 623 P.2d at 438-49
 
 . It was not until the 2001
 
 Mottl
 
 case that the "injury in fact" test was applied to HRS § 632-1. The statutory language of HRS § 632-1 has never included an "injury in fact" requirement, so there was no "injury in fact" requirement to remove. In addition, nothing in this opinion removes the requirement of a "justiciable controvers[y] presented in an adversary context."
 

 We again stress that we are not addressing "taxpayer standing," as does the Chief Justice's Dissent, but rather Tax Foundation's HRS § 632-1 standing. Based on the existence of HRS § 632-1 standing, it is not necessary to address "traditional standing" or "taxpayer standing."
 

 We note that the circuit court did not reach the parties' arguments on the merits, having ruled that the cross-motions for summary judgment were moot. However, this court may decide questions of law even when they were not reached by the trial court.
 
 Gregg Kendall & Assocs., Inc. v. Kauhi
 
 ,
 
 53 Haw. 88
 
 , 94,
 
 488 P.2d 136
 
 , 141 (1971) ;
 
 see also
 

 Bush v. Watson
 
 ,
 
 81 Hawai'i 474
 
 , 487,
 
 918 P.2d 1130
 
 , 1143 (1996) (holding third-party agreements violated the Hawaiian Homes Commission Act despite trial court not ruling on that issue).
 

 The parties dispute whether Honolulu taxpayers have been classified by the legislature as a result of HRS § 248-2.6. Tax Foundation argues that Honolulu taxpayers are a "distinctive class" as a result of the State's interpretation of HRS § 248-2.6, because they alone fund State functions available to all Hawai'i residents through their contributions to the surcharge, a portion of which is retained by the State. The State asserts that the legislature has made no classification as a result of HRS § 248-2.6 because each county was permitted to levy a surcharge on state tax by passing the required ordinance, and therefore there is "no differential treatment of Honolulu residents even if other counties have not chosen to implement the surcharge." For the purposes of this discussion, we assume that Tax Foundation is correct since Honolulu taxpayers are subject to a different tax burden from those of other counties.
 

 "Injury in fact has always included harm to economic interests."
 
 Akau
 
 ,
 
 65 Haw. at 389
 
 ,
 
 652 P.2d at 1135
 
 (citation omitted). However, we "recognize a variety of interests that, if injured, can form the basis for standing."
 
 Superferry I
 
 ,
 
 115 Hawai'i at 321
 
 ,
 
 167 P.3d at 314
 
 . For example, it is well-established that "injuries to recreational and aesthetic interests" may form the basis for a plaintiff's standing in environmental cases.
 

 Id.
 

 The Dissenting Opinion by Nakayama, J., contends that I address taxpayer standing
 
 sua sponte
 
 because Tax Foundation "did not raise taxpayer standing." I respectfully disagree. Tax Foundation's argument that it, "
 
 as a taxpayer
 
 , [is] continuously injured by the State[,]" directly concerns whether Tax Foundation, "as a taxpayer," has a right to seek relief against the State for this alleged injury. To assist in this determination, we may consider whether Tax Foundation has met the test for taxpayer standing.
 

 Moreover, because Tax Foundation seeks declaratory relief, we should consider its standing argument in light of the legislature's intent to "mak[e] the courts more serviceable to the people."
 
 See
 
 HRS § 632-6 ;
 
 Citizens for Prot. of N. Kohala Coastline v. Cty. of Hawai'i
 
 ,
 
 91 Hawai'i 94
 
 , 100,
 
 979 P.2d 1120
 
 , 1126 (1999) ;
 
 Cty. of Hawai'i v. Ala Loop Homeowners
 
 ,
 
 123 Hawai'i 391
 
 , 433-34,
 
 235 P.3d 1103
 
 , 1145-46 (2010). Foreclosing our analysis of Tax Foundation's alleged injury under these circumstances would contradict this principle.
 
 See
 

 Life of the Land II
 
 ,
 
 63 Haw. at 173-74
 
 ,
 
 623 P.2d at 439
 
 ("[W]hile every challenge to governmental action has not been sanctioned, our basic position has been that standing requirements should not be barriers to justice.").
 

 The term "pecuniary loss" as it is used here includes current or future pecuniary loss.
 
 See
 

 Hawaii's Thousand Friends
 
 ,
 
 70 Haw. at 282
 
 ,
 
 768 P.2d at 1298
 
 ("The taxpayer must show that he has sustained
 
 or will sustain
 
 pecuniary loss by the increase of the burden of taxation." (citing
 
 Munoz
 
 ,
 
 40 Haw. at 682
 
 (emphasis added)).
 

 Characterizing the second part of the first sentence in subsection (b) as describing a "threatened controversy" is consistent with the reference in subsection (b) to availability of declaratory relief in "an actual or threatened controversy." HRS § 632-1(b).
 

 This court has observed that " 'ripeness is peculiarly a question of timing,' and the relevant prudential rule deals with '[p]roblems of prematurity and abstractness' that may prevent adjudication in all but the exceptional case."
 
 State v. Fields
 
 ,
 
 67 Haw. 268
 
 , 274,
 
 686 P.2d 1379
 
 , 1385 (1984) (citations and some brackets and internal quotation marks omitted). We have recognized that rulings dismissing a matter for lack of ripeness indicate that "a later decision" is more preferable, or "that the matter is not yet appropriate for adjudication."
 
 Id.
 
 at 275,
 
 686 P.2d at 1385
 
 (citations and internal quotation marks omitted).
 

 Respectfully, the Majority's analysis omits statutory language requiring "the court [to be] satisfied" that each element has been established. HRS § 632-1(b). This omitted language helps to highlight a fundamental inconsistency between the Majority's concept of "HRS § 632-1 standing" (as comprised of elements of HRS § 632-1(b) ) and the Majority's position that Hawai'i state courts "are not required to [consider standing], as they would be required to do with issues of subject matter jurisdiction."
 

 As a jurisdictional statute, HRS § 632-1(b) expressly sets forth the "essentials to [declaratory] relief" for the court to exercise its jurisdiction, requiring "the court [to be] satisfied" that certain statutory elements in subsection (b) have been met. HRS § 632-1(b).
 

 The Majority construes these same elements as a test for "HRS § 632-1 standing." Nevertheless, the Majority opines that "Hawai'i courts are not required to [consider standing]." By this token, the Majority appears to adopt the position, contrary to the statute's plain language, that the "essentials to [declaratory] relief" in subsection (b) need only be considered when the issue of "HRS § 632-1 standing" is expressly raised.
 

 In making this comparison, the court observed that "an 'aggrieved person' is one who has suffered an injury in fact."
 
 132 Hawai'i at 341
 
 ,
 
 322 P.3d at 236
 
 (citation omitted). The
 
 Asato
 
 majority opinion thus recognized that the "injury in fact" test may be applied to assess standing, even if the terms "injury in fact" are not found in the statutory language.
 
 See
 

 id.
 

 In
 
 Credit Associates
 
 , a collection agency filed an action against the defendants to recover an amount owed on a promissory note, and the defendants counterclaimed, alleging, among other things, unauthorized practice of law.
 
 56 Haw. at 105
 
 ,
 
 529 P.2d at 199
 
 . Before trial, the parties stipulated to dismiss all claims, except the defendants' counterclaim for unauthorized practice of law.
 

 Id.
 

 The trial court approved the stipulation and issued a summary judgment concluding that the plaintiff was not engaged in the unauthorized practice of law.
 

 Id.
 

 On appeal, this court "consider[ed] the summary judgment to be a declaratory judgment" because the defendants sought a declaratory judgment under HRS § 632-1.
 

 Id.
 

 We held that "[w]here a stipulated dismissal with prejudice of the complaint in favor of the [defendants] is filed prior to trial on the merits, the [plaintiffs] and [defendants] no longer have a concrete interest in an actual controversy to empower the trial court to render a declaratory judgment."
 
 Id.
 
 at 105,
 
 529 P.2d at
 
 200 (citing
 
 Hanes Dye and Finishing Co. v. Caisson Corp.
 
 ,
 
 309 F.Supp. 237
 
 , 240 (M.D.N.C. 1970), and
 
 Aetna Life Ins. Co. v. Haworth
 
 ,
 
 300 U.S. 227
 
 , 239-241,
 
 57 S.Ct. 461
 
 ,
 
 81 L.Ed. 617
 
 (1937) ).
 

 The Majority contends that in
 
 Citizens
 
 , "[w]e were clear ... that the three part 'injury in fact' test did not govern standing for HRS § 632-1 declaratory judgment actions, ... concluding that 'Citizens asserts personal and special interests sufficient to invoke judicial resolution under HRS § 632-1.' " Opinion by McKenna, J., at 144 Hawai'i at 198, 439 P.3d at 150 (quoting
 
 Citizens
 
 , 91 Hawai'i at 101, 979 P.2d at 1127 ) However, the
 
 Citizens
 
 decision clearly applied the "injury in fact" test for plaintiff's standing. In that case, we first noted that "Citizens asserts personal and special interests sufficient to invoke judicial resolution under HRS § 632-1."
 
 Citizens
 
 , 91 Hawai'i at 101, 979 P.2d at 1127. Then, after describing the specific injury asserted by Citizens, we concluded that "although Citizens' members are neither owners nor adjoining owners of the Mahukona project,
 
 they nonetheless alleged an injury in fact sufficient to constitute standing to participate in a declaratory judgment action
 
 ."
 
 Id.
 
 (emphasis added). Thus, this court applied the "injury in fact" test to the HRS § 632-1 action in that case.
 

 The Majority contends that
 
 Bremner
 
 is inapposite because it cited
 
 Bush v. Watson
 
 ,
 
 81 Hawai'i 474
 
 , 479,
 
 918 P.2d 1130
 
 , 1135 (1996), as authority for applying the three-part "injury in fact" test to HRS § 632-1 standing, reasoning that "
 
 Bush
 
 was brought under
 
 42 U.S.C. § 1983
 
 , not HRS § 632-1." Opinion by McKenna, J., at 144 Hawai'i at 199 n.33, 439 P.3d at 151 n.33 However, this fact is immaterial to, and does not lessen, the persuasive value of the ICA's substantive analysis regarding standing requirements in the context of HRS § 632-1 actions.
 
 Bremner
 
 's discussion on this point did not depend on
 
 42 U.S.C. § 1983
 
 , and therefore cannot be meaningfully distinguished on that basis.
 

 The ICA first acknowledged that, traditionally, "[w]hether a plaintiff has the requisite 'personal stake' in the outcome of the litigation is measured by a three-part, 'injury in fact' test."
 
 Bremner
 
 ,
 
 96 Hawai'i at 139
 
 ,
 
 28 P.3d at 355
 
 . The ICA also recounted this court's precedent illustrating that it has adopted "a more expansive interpretation of standing," whereby "a plaintiff's 'personal stake' in the outcome of a controversy may arise from a defendant's infringement of personal or special interests that is separate and distinct from the traditional basis of infringement of legal rights or privileges."
 

 Id.
 

 at 140
 
 ,
 
 28 P.3d at 356
 
 . Moreover, the ICA recognized that "standing requirements may be 'tempered' or otherwise 'prescribed' by legislative declarations of policy" including HRS Chapter 632,
 

 id.
 

 (quoting
 
 Life of the Land II
 
 ,
 
 63 Haw. at 172
 
 ,
 
 623 P.2d at
 
 438 ), which contains language that " 'interposes less stringent requirements for access and participation in the court process' than traditional standing requisites might otherwise dictate."
 
 Id.
 
 at 141,
 
 28 P.3d at 357
 
 (quoting
 
 Citizens
 
 , 91 Hawai'i at 100, 979 P.2d at 1126 ).
 

 The late Judge John S.W. Lim authored the decision.
 

 Generally, where the parties themselves have not raised or otherwise challenged whether the plaintiff has standing in the first instance, this court has the authority to address the matter on its own accord where necessary.
 
 See
 

 State v. Armitage
 
 ,
 
 132 Hawai'i 36
 
 , 55,
 
 319 P.3d 1044
 
 , 1063 (2014) ("
 
 Although not explicitly argued by the parties
 
 , this court must consider the issue of standing
 
 sua sponte
 
 , because a plaintiff without standing is not entitled to invoke a court's jurisdiction.") (brackets and internal quotation marks omitted) (emphasis added) (citing
 
 Sierra Club v. Haw. Tourism Auth.
 
 ,
 
 100 Hawai'i 242
 
 , 250,
 
 59 P.3d 877
 
 , 885 (2002) ).
 

 Here, however, the State raised the issue of whether Tax Foundation has standing to challenge its implementation of HRS § 248 -2.6 before the trial court and on appeal. Therefore, rather than
 
 sua sponte
 
 raising the issue of standing in and of itself, the Chief Justice considers an alternative
 
 legal theory
 
 upon which Tax Foundation could have, but has not, relied to establish that it had standing. In my view, this court's duty to independently consider the issue of standing where the matter has not been raised does not include a duty to
 
 sua sponte
 
 raise alternative theories of standing where a party has expressly called the plaintiff's standing into question, but the plaintiff's arguments have failed to establish that it has standing.
 

 To establish tax payer standing, two requirements must be met: "(1) plaintiff must be a taxpayer who contributes to the particular fund from which the illegal expenditures are allegedly made; and (2) plaintiff must suffer a pecuniary loss, which, in cases of fraud, are presumed."
 
 Hawaii's Thousand Friends v. Anderson
 
 ,
 
 70 Haw. 276
 
 , 282,
 
 768 P.2d 1293
 
 , 1298 (1989).
 

 See
 

 Koprowski v. Baker
 
 ,
 
 822 F.3d 248
 
 , 259 (6th Cir. 2016) ("Only in exceptional cases or particular circumstances or when the rule [of party presentation] would produce a plain miscarriage of justice do we exercise our discretion to entertain arguments not raised [by the parties.]" (quoting
 
 Rice v. Jefferson Pilot Fin. Ins. Co.
 
 ,
 
 578 F.3d 450
 
 , 454 (6th Cir. 2009) )).